FILED'09 FEB 25 15:49 USDC-LAE

UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF LOUISIANA

Renee S. Hartz, M.D.                                    CIVIL ACTION
                                                       NO. 06: 3164

VERSUS

VICTOR R. FARRUGIA,                                    SECTION "A" (5)
ROBERT A. KUTCHER,                                     JUDGE ZAINEY
NICOLE TIGER, AND
CHOPIN, WAGER, RICHARD &                               MAGISTRATE CHASEZ
KUTCHER LLP

* * * * * * * * * * * * * * * * * * *

MEMORANDUM OF RENEE S. HARTZ, M.D. IN OPPOSITION TO
ROBERT A. KUTCHER, NICOLE TYGIER, AND CHOPIN, WAGAR,
RICHARD & KUTCHER LLP'S MOTIONS FOR SUMMARY JUDGEMENT

MAY IT PLEASE THE COURT:

Plaintiff, Renee S. Hartz, M.D. ("Dr. Hartz"), respectfully

submits this Memorandum In Opposition To Robert A. Kutcher, Nicole

Tygier, and Chopin, Wagar, Richard & Kutcher LLP's Motions For

Summary Judgment (Document 63-2, & 65-2).

As will be fully demonstrated herein, the motions for summary

judgment submitted by Robert A. Kutcher, Nicole Tygier, and Chopin,

Wagar, Richard & Kutcher LLP lack merit and should be denied.

INTRODUCTION

Dr. Hartz began her employment at Tulane University School of

Medicine ("Tulane") in July, 1997 as a Professor of Surgery.[1]

During relevant times, Dr. Hartz practiced surgery at Tulane

University Hospital and Clinic ("TUHC").[2]   Tulane notified Dr.

Hartz she had been denied tenure by letters dated June 21, 2002 and

---

[1] See Complaint, par. 6; Exhibit A Hartz Deposition page 35-37.

[2] See Complaint par. 6; Exhibit A Hartz Deposition page 35-37.

___ Fee_____
___ Process___
_X_ Dktd_____
___ CtRmDep____
___ Doc. No.____

July 16, 2002.[3]

The last discriminatory/retaliatory act concerning Dr. Hartz's denial of tenure occurred on July 16, 2002.  On that date Tulane Medical School's Executive Faculty Committee ("EFC") denied Dr. Hartz tenure (which a committee of her peers, senior medical school faculty — the Promotion and Honors Committee — had recommended)[4].

Similarly, the last discriminatory/retaliatory act concerning Dr. Hartz's hostile work environment also occurred on July 16, 2002 when her Department Chairman, Dr. Hewitt, participated in the Executive Faculty Committee decision to deny her tenure (which a committee of her peers, senior medical school faculty — the Promotion and Honors Committee -- had recommended).[5]

> . . . Hartz sufficiently states a hostile work environment claim since she alleges that Hewitt, her supervisor, engaged in a variety of discriminatory and retaliatory activities with the apparent aim of sabotaging her career and ability to gain tenure. Nevertheless, we conclude that her EEOC charge regarding her hostile work environment claim was also untimely filed . . . Hartz provides no dates of discriminatory or retaliatory actions against her by Hewitt or anyone else that postdate her [July 16, 2002] denial of tenure.[6]

---

[3]See Complaint par. 8, 9, 10, 11, 12, 19; Exhibit A Hartz Deposition pages 128-136.

[4]See related case – Hartz. v. Adm. of the Tulane Educational Fund; University Healthcare System, L.C., No. 07-30506 (USDC No. 2:06-CV-2977) (unpublished, U.S. Fifth Circuit Court) page 10.

[5]See related case – Hartz. v. Adm. of the Tulane Educational Fund; University Healthcare System, L.C., No. 07-30506 (USDC No. 2:06-CV-2977) (unpublished, U.S. Fifth Circuit Court) page 11.

[6]See related case – Hartz. v. Adm. of the Tulane Educational Fund; University Healthcare System, L.C., No. 07-30506 (USDC No. 2:06-CV-2977) (unpublished, U.S. Fifth Circuit Court) page 11, and n. 3.

Dr. Hartz engaged Mr. Victor R. Farrugia, Esq. ("Mr. Farrugia"), to represent her in her dispute with Tulane (and TUHC) regarding her denial of tenure.[7]  Mr. Farrugia began his legal representation of Dr. Hartz prior to April 17, 2003.[8] Mr. Farrugia failed to timely file (and/or advise Dr. Hartz to timely file) an EEOC charge within 300 days of her notice of denial of tenure.[9]  In June 2003 Dr. Hartz was unable to contact him (unbeknownst to Dr. Hartz, he was vacationing).

Because Dr. Hartz was unable to communicate with Mr. Farrugia, she sought legal counsel from Mr. Kutcher and Ms. Tygier about her dispute with Tulane.[10]  After informing Mr. Kutcher and Ms. Tygier that she was unable to contact Mr. Farrugia and that she needed help with her dispute with Tulane, Dr. Hartz provided certain

---

[7] See Complaint par. 21; Exhibit A Hartz Deposition pages 157, 160.

[8] On or about March 26, 2003 Dr. Hartz paid Mr. Farrugia $10,000.00.

[9] See Complaint par. 21; Exhibit A Hartz Deposition pages 193.

[10] See Complaint par. 26., Answer par. 26; also Exhibit 2 Hartz Deposition, page 262:
   page 262: . . . I made it very clear to them [Mr. Kutcher and Ms. Tygier] that I came to them because I could not find my counsel [Mr. Farrugia], so I couldn't get him, he hadn't been useful to me. He hadn't been upfront with me and so I went to them for their help in remedying the issue of having an attorney who was —
   page 265: . . . I'm asking them for a completely different type of help. I'm asking them to tell me what my options are, what are deadlines, what dates do I have to look forward to?  Am I barking up the wrong tree, do I have a real case, has Farrugia led me wrong? . . .
   All I can say is this [bill] says Tulane tenure negotiations and this is not the reason I went to them.  I went to them for help.  I went to them for help with my dispute against Tulane.
   page 259: . . . I went to them asking for their help.  I went to them begging to help me with this discriminatory dispute with Tulane.  I felt that I had been extremely wronged, that I'm very qualified.

documents to Ms. Tygier. Two Tulane letters dated June 21, 2002 and July 16, 2002 notifying Dr. Hartz she had been denied tenure were provided to Ms. Tygier by Dr. Hartz.[11] Additionally, Dr. Hartz provided Ms. Tygier a draft letter addressed to Tulane's Equal Employment Opportunity Officer (EEO).

The first paragraph of the draft letter states:

> This letter supplements the gender discrimination and retaliation claims that I filed with you on March 31st, 2003 and also serves as formal documentation to the FTFR regarding the same issues, concerning my complaints of gender discrimination and retaliation. I have received no response to my letter to you despite the fact that the Bylaws state that a response should have been received within 30 days. Further, you specifically stated to me that I should not file a complaint with EEOC "until I received tenure." Since the FTFR Committee denied me tenure, I am now adding that final denial of tenure to my claims of discrimination and retaliation.[12]

Despite learning that Dr. Hartz had received notice of denial of tenure by letters dated June 21, 2002 and July 16, 2002, despite learning that Dr. Hartz was complaining of denial of tenure based on sex discrimination, despite learning that Dr. Hartz had been advised not to file an EEOC charge "until [she] received tenure", and despite Dr. Hartz having engaged Mr. Kutcher and Ms. Tygier to help her with her dispute with Tulane, Mr. Kutcher and Ms. Tygier did not inform Dr. Hartz: 1) more than 300 days had elapsed from the time Tulane notified Dr. Hartz she had been denied tenure, 2) that the EEOC charge filing period for a denial of tenure claim had elapsed, 3) of a potential malpractice claim against Mr. Farrugia

---

[11]See Exhibit B. Mr. Kutcher and Ms. Tygier's Response to Hartz's Production Request #1.

[12]See Robert A. Kutcher, Nicole Tygier, and Chopin, Wagar, Richard & Kutcher LLP's Document 65-3, Exhibit 5.

existed, and 4) that there existed prescriptive/peremptive dates of such potential malpractice claim.

Because Mr. Kutcher and Ms. Tygier did not inform Dr. Hartz of these facts, Dr. Hartz did not learn of these issues within the three (3) year time period for asserting a potential malpractice claim against Mr. Farrugia (which would have been based upon his allowing her Title VII claim to become timebarred). According to Mr. Kutcher and Ms. Tygier it was not their duty to inform Dr. Hartz of issues affecting her dispute with Tulane.

According to Mr. Kutcher and Ms. Tygier, they

"were only requested to assist her with her 'Tulane Tenure Negotiations' and in particular with the drafting of a letter to Mary Smith [Tulane EEO]. Dr. Hartz never mentioned the filing of an EEOC charge against Tulane and never even mentioned the possibility of suing Victor Farrugia."[13],[14]

An attorney-client relationship existed between Dr. Hartz and Mr. Kutcher and Ms. Tygier concerning Dr. Hartz's dispute with Tulane. Their Answer, paragraph 26 states: "It is admitted that while plaintiff was continuing to be represented by defendant Victor Farrugia, plaintiff sought additional legal counsel from the law firm defendants concerning her dispute with Tulane."[15] In spite of this admission, Mr. Kutcher and Ms. Tygier now maintain:

---

[13] See Document 65-2, page 12.

[14] Exhibit A, Hartz Deposition, page 265: . . . I'm asking them for a completely different type of help. I'm asking them to tell me what my options are, what are deadlines, what dates do I have to look forward to? Am I barking up the wrong tree, do I have a real case, has Farrugia led me wrong? . . .
All I can say is this [bill] says Tulane tenure negotiations and this is not the reason I went to them. I went to them for help. I went to them for help with my dispute against Tulane.

[15] See Defendant's Answer par. 26.

> That the Chopin defendants had a very limited and specific involvement with Tulane, which essentially took place between June 22, 2003 and June 30, 2003. That representation was for a specific purpose of assisting her, with her ongoing tenure negotiation with the drafting of a response letter to Mary Smith, the EEOC/Affirmative Action Compliance officer that worked for Tulane.[16]

Mr. Kutcher and Ms. Tygier's billing statement reflects a more comprehensive representation. For example, their billing statement begins on June 22, 2002 with the last billing entry listed as July 16, 2003. The July 16, 2003 entry reads: "Phone call from client regarding status". The Mary Smith letter was completed by June 30, 2003 for Dr. Hartz's signature and had been forwarded to Ms. Smith, according to Mr. Kutcher and Ms. Tygier, their representation was limited to the Mary Smith letter, yet on July 16, 2003 Ms. Tygier's billing record has Ms. Tygier and Dr. Hartz discussing the "status" of the dispute with Tulane. For example, their billing statement reflects telephone calls with "opposing counsel", John Beal, Tulane School of Medicine General Counsel, regarding "meeting".

The letter to Ms. Smith and e-mails referring to her by Mr. Kutcher and Ms. Tygier never misstated her Title as "EEOC Affirmative Action Compliance Officer" as they state here.[17] Their letter to Mary Smith is addressed to "Equal Employment Officer, Mary Smith" at Tulane. The e-mails Ms. Tygier asserts she sent to Dr. Hartz refer to Mary Smith as "EEO".[18] Ms. Smith was not an employee of the "Equal Employment Opportunity Commission,"

---

[16]See Document 65-2, page 14.

[17]See Document 65-2, page 2.

[18]See Exhibit B, Mr. Kutcher and Ms. Tygier's Response to Hartz Production Request No. 1.

a federal agency.  Mr. Kutcher and Ms. Tygier attempt to "blur" the distinction between "EEO" at Tulane and "EEOC" now.  However, their documents reflect the distinction was crystal clear before this litigation.

Mr. Kutcher and Ms. Tygier assert that Dr. Hartz told them on July 16, 2003 to "hold off" so Mr. Farrugia continue the tenure negotiations.  Dr. Hartz disputes their characterization of the event.  She said they told her they would hold off and "just go back to him [Mr. Farrugia].[19]  Dr. Hartz was entitled to rely on Mr. Kutcher and Ms. Tygier expertise and diligence that Mr. Farrugia was managing her dispute properly.

On August 22, 2003, Dr. Hartz filed a charge with the Equal Employment Opportunity Commission ("EEOC").  Her charge asserted denial of tenure based on discriminatory and retaliatory actions by Tulane.[20]  In <u>Hartz. v. Adm. of the Tulane Educational Fund; University Healthcare System, L.C.</u>, the Fifth Circuit Court determined that Dr. Hartz's EEOC charge had not been timely filed.[21]  This resulted in Dr. Hartz's inability to challenge the alleged discriminatory conduct in court pursuant to 42 U.S.C.

---

[19]Exhibit A, Hartz Deposition 254, 255.
    The client is entitled to rely on the expertise and diligence of his attorney.  <u>Myers v. Imperial Cas. Indem. Co.</u>, 451 So.2d 649 (La. App. 3rd Cir. 1984).  The proper method of determining whether an attorney's malpractice caused damage to his client is whether the performance of that act would have prevented the damage.  <u>Ault v. Bradley</u>, 564 So.2d 374 (La. App. 3rd Cir. 1990), <u>writ denied</u>, 569 So.2d 967 (La. 1990).

[20]<u>See</u> Complaint par. 18; Exhibit A, Hartz Deposition pages 193 -194.

[21]The 300 day charge filing period began from either the notice of denial of tenure on June 21, 2002 or July 16, 2002.  By May 13, 2003 more than 300 days had elapsed.

Section 2000e-5(f)(1); Delaware State College v. Ricks, 449 U.S. 250 (1980); Ledbetter v. Goodyear Tire & Rubber Co., Inc., 127 S.Ct. 2162, 2166-67 (2007). Dr. Hartz was also unable to assert any claim against TUHC because TUHC was not named in her EEOC charge.[22]

> Mr. Kutcher and Ms. Tygier of the lawfirm Chopin, Wagar, Richard & Kutcher, LLP, consulted thereafter [when Dr. Hartz was unable to contact Mr. Farrugia] had an affirmative duty to advise Dr. Hartz of the potential malpractice claim existing against Mr. Farrugia, and the time periods within which such a claim must be made. These duties are essential components of competent representation, and the failure by counsel to so advise Dr. Hartz [was] a breach of the standard of care in the Louisiana legal community.[23]

On account of Mr. Kutcher and Ms. Tygier's failure to inform Dr. Hartz of the potential malpractice claim she had against Mr. Farrugia, and the time periods within which such a claim must be made, Dr. Hartz did not learn of Mr. Farrugia's potential malpractice within the time period allowed for bringing a negligence claim against him regarding the EEOC charge issue, i.e., for her Title VII claims.[24]

More than three (3) years elapsed before Dr. Hartz was informed of Mr. Farrugia's alleged negligence in representing her

---

[22]See related case - Hartz. v. Adm. of the Tulane Educational Fund; University Healthcare System, L.C., No. 07-30506 (USDC No. 2:06-CV-2977) (unpublished, U.S. Fifth Circuit Court) page 8.

[23]See Exhibit C, Alston Expert Report and Affidavit.

[24]See Complaint par. 29, 30, 31(2), 33, 36. See Exhibit A, Hartz Deposition pages 242-243, 251-252, 254, 255-266, 270-272, 356-359, 361.

with respect to her Title VII claims.[25]

Mr. Kutcher and Ms. Tygier maintain Dr. Hartz must show that she lost her cause of action against Mr. Farrugia "while she was represented by [them]".[26]  However, Dr. Hartz complains about Mr. Kutcher and Ms. Tygier's failure to inform her of the potential malpractice claim she had against Mr. Farrugia, and the time periods within which such a claim must be made.  Because of their failure, Dr. Hartz did not learn of Mr. Farrugia's potential malpractice within the time period allowed for bringing a negligence claim against him regarding the EEOC charge issue, i.e., for her Title VII claims.  As a result of the negligence of Mr. Kutcher and Ms. Tygier, Dr. Hartz suffered injury -- the loss of her right to proceed against Mr. Farrugia concerning his negligence in representing her in her Title VII claims, and the value of the damages of that lost right.[27]  An economist performed an analysis of Dr. Hartz's damages.[28]

Dr. Hartz was unaware of any potential malpractice claims until June 4, 2006 when she was so advised by her undersigned

---

[25]Dr. Hartz's Complaint does not allege that Defendants Kutcher, Tygier, and Chopin, Wagar were negligent in failing to advise her to file an EEOC charge.  Her Complaint at paragraph 28 alleges that Defendants Kutcher, Tygier, and Chopin, Wagar, were negligent in failing to advise her that Mr. Farrugia had been negligent in failing to advise her to timely file her EEOC charge in order to preserve her Title VII discrimination and retaliation claims.  See Complaint par. 32(6) & (7).  See Exhibit A, Hartz Deposition pages 242-243, 251-252, 255-266, 270-272, 356-359, 361.

[26]See Document 65-2, page 1.

[27]See Complaint par. 29, 30, 31(2), 32(6)&(7), 33, 36.  See Exhibit A, Hartz Deposition pages 242-243, 251-252, 254, 255-266, 270-272, 356-359, 361.

[28]See Exhibit D, Dalton Affidavit with Report.

9

counsel and also advised that Tulane would likely assert that her EEOC charge was untimely filed.[29]   On June 8, 2006, Dr. Hartz filed suit against Tulane and TUHC (C.A. No. 06-2977) regarding her denial of tenure alleging discrimination based on sex and retaliation for previous protected activity.[30]   That action, referenced above was dismissed by the U.S. Fifth Circuit (unpublished opinion) on April 16, 2008.[31]

Dr. Hartz's potential malpractice claim against Mr. Farrugia alleged he had failed to timely file a state law discrimination claim against Tulane and TUHC.[32]   Dr. Hartz did not sue Mr. Farrugia for failure to timely file an EEOC charge because such claim was perempted as more than three years elapsed before she

---

[29]See Complaint par. 33, 36. See Exhibit A, Hartz Deposition pages 242-243, 251-252, 255-266, 270-272, 356-359, 361.

[30]See Complaint par. 39.   See Exhibit E, Complaint Hartz. v. Adm. of the Tulane Educational Fund, et al, (C.A. No. 06-2977).

[31]The Fifth Circuit opinion states Dr. Hartz's counsel was "unprofessional" to the Court during oral argument.   However, it does not state he was "unprepared."  The "comment on the conduct" of Dr. Hartz's counsel at the Fifth Circuit, states that such is "completely separate and apart from the issues raised on appeal." No conduct or rendition verbatim of any case could have altered the untimeliness of the EEOC charge.  A good faith argument was made on behalf of Dr. Hartz that Ricks was distinguishable on the facts and that certain actions of Tulane officials (Dean, Provost, President) during the university appeal process were discriminatory and/or retaliatory.   The Fifth Circuit rejected that argument.

[32]That claim was dismissed because neither Tulane (a non-profit educational institution) nor TUHC (who was not Dr. Hartz's employer) could be sued under the state law discrimination statute. In this malpractice action, this Court has determined that Dr. Hartz could not have asserted a state-law employment discrimination action against either Tulane nor TUHC. See Order and Reasons, July 18, 2008, and October 3, 2008.

learned of such failure.[33]

Dr. Hartz asserted two claims of alleged malpractice against Mr. Kutcher and Ms. Tygier. First, Dr. Hartz alleged they had failed to timely file a state law discrimination claim against Tulane and TUHC.[34] Second, Dr. Hartz alleged they had failed to advise her of her potential malpractice claim against Mr. Farrugia and the time periods within which such a claim must be made, and because of their failure, Dr. Hartz did not learn of Mr. Farrugia's negligence within the time period allowed for bringing a negligence claim against him regarding the EEOC charge issue, i.e., for her Title VII claims.[35] Mr. Kutcher and Ms. Tygier incorrectly state at page 8 of their Memorandum In Support Of Summary Judgment (Document 63-3), that the "Court dismissed any claims against the Chopin defendants concerning . . . any claim that they negligently failed to timely file the EEOC charge."[36]

Dr. Hartz's "underlying claim" for Mr. Kutcher and Ms. Tygier's alleged malpractice, is Mr. Farrugia's potential malpractice. Mr. Farrugia's potential malpractice, was not timely filing an EEOC charge (or timely advising Dr. Hartz to file an EEOC charge). A claim for legal malpractice against Mr. Farrugia would

---

[33]See Complaint par. 29, 30, 31(2).

[34]This claim was dismissed: Dr. Hartz could not assert a state-law discrimination claim against Tulane or TUHC, See n. 32.

[35]See Complaint par. 29, 30, 31(2), 33, 36. See Exhibit 2, Hartz Deposition pages 242-243, 251-252, 254, 255-266, 270-272, 356-359, 361.

[36]No "claim that they negligently failed to timely file the EEOC charge" was dismissed because Dr. Hartz never asserted such a claim against Mr. Kutcher or Ms. Tygier.

have been stated under Louisiana law, because there was: 1) an
attorney—client relationship, 2) the attorney was negligent in
his representation of the client, and 3) this negligence caused
plaintiff some loss.  Evans v. Detweiler, 466 So.2d 800, 802
(La.App. 4th Cir. 1985).  An attorney is negligent in handling a
case if he fails "to exercise at least that degree of care, skill
and diligence which is exercised by prudent practicing attorneys
in his locality."  Ramp v. St. Paul Fire and Marine Ins. Co., 263
La. 774, 269 So.2d 239 (La. 1972).  An attorney is negligent if
he accepts employment and causes the loss of opportunity to
assert a claim for recovery.  Jenkins v. St. Paul Fire and Marine
Ins. Co., 422 So.2d 1109 (La. 1982).  An attorney owes his client
the duty of diligent investigation and research.  Muse v. St.
Paul Fire and Marine Ins. Co., 328 So.2d 698 (La. App. 1st Cir.
1976).  Finklestein v. Collier, 636 So.2d 1053, 1058 (La. App. 5th
Cir. 1994).  Dixon v. Perlman,  528 So.2d 637, 1058 (La. App. 2nd
Cir. 1988).

Regarding the "underlying claim," i.e., Mr. Farrugia's
potential malpractice in not timely filing an EEOC charge (or
timely advising Dr. Hartz to file an EEOC charge), the facts are
not in dispute.  There was an attorney—client relationship
between Dr. Hartz and Mr. Farrugia.  Mr. Farrugia was negligent,
i.e., when Dr. Hartz's August 22, 2003 EEOC charge was filed the
charge filling time period had already run.[37]  It is undisputed
Mr. Farrugia's negligent filing of the untimely charge caused Dr.

---

[37]See Exhibit C, Alston Expert Report and Affidavit.

Hartz's claims against Tulane and TUHC to be time-barred.[38]
The untimely charge caused Dr. Hartz "some loss", i.e., the
opportunity to proceed with her Title VII claims against Tulane
and TUHC.  Thus Dr. Hartz's "underlying claim" claim of legal
malpractice against Mr. Farrugia would have succeeded.

Since the underlying claim against Mr. Farrugia would have
succeeded, then with respect to her alleged malpractice claim
against Mr. Kutcher and Ms. Tygier, Dr. Hartz has suffered a loss.

Mr. Kutcher and Ms. Tygier incorrectly state that Dr. Hartz
asserts "that her former attorneys [i.e., Farrugia, Kutcher, and
Tygier] committed legal malpractice, and but for that legal
malpractice she would have been successful on her discrimination
claims against Tulane."[39]   Dr. Hartz has not "lumped" the
actions/inactions of Mr. Farrugia, and Mr. Kutcher and Ms. Tygier
together.

Dr. Hartz does <u>not</u> assert that Mr. Kutcher or Ms. Tygier's
alleged malpractice caused her to lose the opportunity to assert
her claims against Tulane.  As stated repeatedly above, the EEOC
charge filing period had run when Mr. Kutcher and Ms. Tygier began
their representation of Dr. Hartz in June 2003.  Dr. Hartz has not
faulted Mr. Kutcher or Ms. Tygier for Dr. Hartz's loss of the
opportunity to assert claims against Tulane or TUHC.  Mr. Kutcher

---

[38]Dr. Hartz filed suit against Tulane and TUHC (C.A. No. 06-
2977) regarding her denial of tenure alleging discrimination based
on sex and retaliation for previous protected activity.   That
action, referenced above was dismissed by the U.S. Fifth Circuit
(unpublished opinion) on April 16, 2008 because the EEOC charge was
untimely filed.

[39]Doc. 63-2, page 12.

and Ms. Tygier did not cause the loss of Dr. Hartz's claims against Tulane or TUHC and that is not the basis of her malpractice claim against them.   Dr. Hartz has asserted that Mr. Kutcher and Ms. Tygier failed to inform Dr. Hartz the EEOC charge filing period had elapsed and of the potential malpractice claim she had against Mr. Farrugia, and the time periods within which such a potential malpractice claim must be made.

Because of Mr. Kutcher and Ms. Tygier's negligence, Dr. Hartz did not learn of Mr. Farrugia's potential malpractice within the time period allowed for bringing a negligence claim against him regarding the EEOC charge issue, i.e., for her Title VII claims.[40] But for Mr. Kutcher and Ms. Tygier's failure to inform her that the EEOC charge filing period had elapsed and of the potential malpractice claim she had against Mr. Farrugia, and the time periods within which such a claim must be made, Dr. Hartz's would have been successful on her potential malpractice action against Mr. Farrugia.

## FACTUAL BACKGROUND[41]

Dr. Hartz is a physician who received Board Certification in Thoracic Surgery in 1982 with a Recertification in 1991 and 2001. Dr. Hartz holds medical licensure in Illinois and Louisiana.   Dr.

---

[40] See Complaint par. 29, 30, 31(2), 33, 36.   See Exhibit A, Hartz Deposition pages 242-243, 251-252, 254, 255-266, 270-272, 356-359, 361.

[41] Although Dr. Hartz's Title VII claims are not the "underlying claims" with respect to Mr. Kutcher or Ms. Tygier's malpractice, the genuine facts concerning Dr. Hartz's dispute with Tulane are set forth here.   Mr. Kutcher and Ms. Tygier are incorrect concerning certain facts regarding Dr. Hartz's employment.

Hartz earned a Bachelor of Arts (B.A.) from Michigan University (1969), and the degree of Medical Doctor (M.D.) from Northwestern University Medical School (1974). She is a Fellow of the American Board of Thoracic Surgery.[42]

During the time period relevant to this action, July, 1997 until June 30, 2003, Dr. Hartz was employed at Tulane University School of Medicine, as a Professor of Surgery, Department of Surgery, Division of Thoracic Surgery, Tulane University School of Medicine. Also, during the time period relevant to this action, Dr. Hartz also practiced thoracic surgery at TUHC, the Medical Center of Louisiana at New Orleans ("MCLNO" or "Charity Hospital Campus" and "University Hospital Campus").[43]

For fifteen years prior to coming to Tulane, Dr. Hartz practiced as a cardiothoracic surgeon in the Chicago, Illinois area and served as a tenured Associate Professor of Surgery, Department of Surgery, Division of Cardiothoracic Surgery, Northwestern University Medical School, and as a Professor of Surgery, Department of Surgery, Division of Cardiothoracic Surgery, University of Illinois at Chicago College of Medicine, where she was also Program Director of the cardiothoracic training program and Chief of Cardiac Surgery.[44]

Dr. Hartz began her employment at Tulane in July, 1997. Dr.

---

[42]See Complaint par. 5; Exh. A Hartz Deposition page 13; Exh. F, Hartz Response to Production Request. No. 9 -- Ex. 23, Hartz CV.

[43]See Complaint par. 6; Exhibit A Hartz Deposition pages 35-37.

[44]See Complaint par. 7., Exhibit F, Hartz Response to Prod. Resp. No. 9 -- Ex. 23, Hartz CV.

Hartz was on a three year tenure track with the understanding that she would be considered for tenure immediately upon her arrival at Tulane.  An offer letter of May 8, 1997 signed by the Dean of the Medical School, Dr. James J. Corrigan, and the Chair of the Department of Surgery and Regents Professor, Dr. Lewis M. Flint offered "a full-time tenure track faculty position with the rank of professor".  The letter stated "an application for tenure will be submitted when you arrive, with the full support of the department of Surgery."[45]

In late 1997 Dr. Hartz voluntarily relinquished certain of her cardiac surgical privileges ("pump privileges") at TUHC pending a review of the outcomes of some surgical cases.[46] However, Dr. Hartz continued to have thoracic surgical privileges at TUHC, where she had an active thoracic practice, and full, unrestricted cardiovascular surgical privileges at Charity Hospital, staffed jointly by physicians at Tulane and LSU Medical Schools.[47]  Also in 1998, with her department Chair's agreement she traveled to Houston, Texas to work as an assistant surgeon with Drs. Denton Cooley and O.H. Frazier, at the renowned Texas Heart Institute.  This was an attempt to maintain her cardiac skills and have the benefit of independent evaluation by the Texas Heart Institute's group.  Dr. Hartz received outstanding

---

[45]See Exhibit F, Hartz Prod. Resp. No. 9, Ex. 24a — 5/8/97 Letter Flint to Hartz.

[46]See Exhibit G, Affidavit of Dr. James V. Talano, M.D., M.M., FACC, Chief of Cardiology, Tulane University School of Medicine, 1996-1998.

[47]See Exhibit H, Affidavit Robert Hallett, M.D., Department of Cardiology, Tulane School of Medicine.

evaluations there.[48]  Dr. O.H. Frazier, Chief of
Cardiopulmonary Transplantation, Director Surgery Research,
Cullen Cardiovascular Research Laboratories, Texas Heart
Institute wrote Dr. Hewitt:

> [Dr. Hartz] is an excellent technical cardiovascular
> surgeon and better than comparable surgeons of her rank and
> station in this profession.  . . . If I needed cardiac
> surgery, I would certainly allow Dr. Hartz to operate on me,
> and I can find no reason for anyone else, experienced in
> this field, to recommend otherwise.[49]

Dr. Hartz was initially considered for tenure in mid-May 1999
and Tulane denied her tenure based on alleged lack of "service" to
her department because she had not yet had full, unrestricted
cardiac surgical privileges (pump privileges) at TUHC restored to
her.[50]  Nearly two years after she relinquished her cardiac pump
privileges, TUHC had not yet completed its "review" concerning her
cardiac surgical privileges.  Pump privileges permitted Dr. Hartz
to operate as the primary surgeon during cardiac surgery.  Based in
large part on the recommendations of Drs. O.H. Frazier and Julie A.
Swain, in mid-June 2000, TUHC proposed that her cardiac privileges
be restored under a rigorous formal "proctorship plan."  Under the
plan, Dr. Hartz would operate with another cardiac surgeon as an
assistant surgeon to demonstrate her abilities as she had been
precluded from operating as a primary cardiac surgeon at TUHC for

---

[48]Exhibit A, Hartz Deposition, page 59.

[49]Exh. F, Dr. Hartz's Response to Production Request. No.9
(Ex. 76, 12/21/98 Letter Frazier to Hewitt, Ex. 101, 1/13/99
Letter Frazier to Hewitt, 2/15/99 Letter Frazier to Hewitt).

[50]When Dr. Hartz arrived at Tulane, the cardiothoracic
surgical program had only two residents.  Once they completed the
program, there were no cardiothoracic surgical residents after July
1999.

two and a half years.   Tulane and TUHC ignored Dr. Hartz's
"proctorship" at the Texas Heart Institute where Dr. Hartz
operated with world renown Drs. Cooley and Frazier as an
assisting surgeon in surgeries as they operated as primary
cardiac surgeons.[51]   Throughout the time she was on the faculty
at Tulane, during the time Dr. Hartz lacked full, unrestricted
"pump privileges", she operated as an assistant cardiac surgeon.
Thus the relinquishment of her "pump privileges" at TUHC pending
its review did not mean that she had no cardiac privileges there.
She simply was not operating as the primary surgeon on cardiac
surgeries requiring "pump privileges."  "Pump privileges" allow
the attachment of a heart pump necessary for open heart surgery.

In July 1999, Dr. Hartz invoked Tulane University's
grievance/appeal process concerning her denial of tenure.   In
September 1999, Dr. Hartz filed a charge of sex discrimination with
the Equal Employment Opportunity Commission ("EEOC") asserting sex
discrimination.[52]   In March 2000, Tulane's Senate Committee on
Faculty Tenure, Freedom  & Responsibility ("FTFR"), Chaired by
Tulane Law School Professor Raymond T. Diamond, determined that in
denying Dr. Hartz tenure the Medical School had "failed to afford
her academic due process" and acted "in contravention of the terms
of the agreement embodied in the letter of May, 8, 1997."[53]

---

[51]See Exhibit I, Affidavit of Dr. Julie A. Swain.

[52]See Complaint par. 8; also, Exh. A, Hartz Dep., page 258 —
Dr. Hartz's attorney was Ms. Judy Giorlando, became seriously ill,
ceased her representation in 2000, then moved from New Orleans.

[53]Exhibit F, Hartz Prod. Resp. No. 9, Ex. 35, 3/31/00
Memorandum FTFR, pp. 2, 5, and 7.

The FTFR found that after Dr. Hartz relinquished her full, unrestricted pump cardiac surgical privileges at TUHC:

> . . . Dr. Flint as departmental chair requested Dr. Hartz to
> 'continue to work diligently to strengthen the academic
> position in the Section of Thoracic Surgery,' (citations
> omitted), and Dr. Hartz did so.  Yet, this work was not
> considered in the tenure decision, and because of the lack of
> a written evaluation, Dr. Hartz was not notified to this
> effect. Moreover, the testimony of both Drs. Hart and Hewitt
> reveals that Dr. Hewitt as departmental chair instructed Dr.
> Hartz not to undertake cardiac heart pump surgery at the
> Charity hospital, where Dr. Hartz maintains her privileges to
> this day.  Dr. Hartz's obedience to the instructions of her
> superior thus accounts in part for inability to perform
> cardiac surgery, and because there were no written
> evaluations, Dr. Hartz had no written notice that her
> obedience to an explicit instruction would be held against
> her.[54]

Dr. Flint, the Chair of the Department of Surgery who offered her a position at Tulane informed the FTFR that the service Dr. Hartz provided through her thoracic surgery practice qualified her for tenure.  Dr. Flint stated to the FTFR that "Dr. Hartz was as qualified as anyone in the last ten years." Dr. Flint informed the FTFR that an offer was made to Dr. Hartz that she join the Tulane faculty and that immediately upon her arrival there would be submission of her dossier for tenure with full departmental support.  Dr. Flint advised the FTFR that the offer imposed no requirement that tenure would be dependent on any specific surgical privileges at TUHC.[55]

The FTFR admonished the Medical School's "failing to develop

_____

[54]Exh. F, Hartz Prod. Resp., Ex. 35, 3/31/00 FTFR Memorandum, p.5, n.5.

[55]Exhibit F, Hartz Prod. Resp., Ex. 35, 3/31/00 Memorandum FTFR, p.4, n.4.; and Flint Affidavit (cited FTFR Memorandum, p.2) Defendants' Response to Hartz Prod. Rqst. No.1 — Flint Affidavit (cited FTFR Memorandum, p.2).

a written and mutually agreeable plan, against which progress or lack thereof could be measured, for Dr. Hartz to regain at the Tulane hospital [TUHC] her privileges to undertake cardiovascular surgery with a heart pump."[56]   The FTFR recommended that Tulane provide Dr. Hartz with a three year probationary period "presumably ample to resolve all issues with respect to privileges [at TUHC]."

The FTFR stated:

> The Committee notes that Dr. Hartz maintains her status as a cardiovascular surgeon with pump privileges at Charity Hospital, staffed jointly by physicians at Tulane and LSU Medical Schools, and that Dr. Hartz continues an active thoracic surgery practice at Tulane hospital, for which she still has privileges.   The Committee recommends that the Medical School clarify whether and to what extent Dr. Hartz's status as a surgeon with privileges to do and hence teach thoracic surgery is relevant to the ultimate decision with respect to her tenure, and that the Medical School clarify to what extent practicing and teaching cardiac surgery at Charity Hospital might affect the ultimate decision as to tenure.[57]

On October 25, 2000 TUHC approved her request for cardiac privileges under a proctorship plan.[58]   April 6, 2001, in view of the FTFR recommendations, Tulane President Scott Cowan proposed a settlement agreement -- an additional three year probationary appointment guaranteeing that Dr. Hartz would receive tenure review during the second year of the period.[59]   Dr. Hartz accepted the compromise, assumed Tulane would act in good faith, and decided not

---

[56]Exhibit F, Hartz Prod. Resp. No. 9, Ex. 35, 3/31/00 Memorandum FTFR, p. 7.

[57]Exhibit F, Hartz Prod. Resp. No. 9, Ex. 35, 3/31/00 Memorandum FTFR, p. 7.

[58]Exhibit F, Dr. Hartz's Prod Resp. No. 9, Ex. 116, 10/25/00 Letter Montgomery/Amedee to Hartz.

[59]Exh. F, Hartz Prod Resp No.9, Ex. 84, 4/06/01 Letter Cowan to Hartz.

to proceed with litigation.[60]

Dr. Hartz continued as a Professor of Surgery at Tulane, and successfully completed the proctorship plan where she operated in 55 cases as first assistant and 10 cases as the primary cardiac surgeon with Drs. Lynn Harrison and Herman Heck of LSU Medical School.[61] On January 30, 2001, TUHC reinstated Dr. Hartz's full, unrestricted cardiovascular surgical privileges ("pump privileges").[62]

Dr. Hartz was again considered for tenure May 20, 2002.   The Tulane Medical School's Personnel and Honors Committee, which, under the provisions of Tulane's Faculty Handbook, is the duly constituted faculty body charged with rendering a decision as to whether Dr. Hartz was qualified for an award of tenure, determined she was qualified for tenure at Tulane and voted in her favor 7-2 to recommend an award of tenure.[63]   The Personnel and Honors Committee determined Dr. Hartz was qualified for tenure and recommended an award of tenure to her in disregard of Dr. Hewitt's vigorous opposition.

In 2002 Dr. Hewitt raised the identical objections he had

---

[60]Mr. Kutcher and Ms. Tygier state that "Tulane made it crystal clear that any future tenure decisions would be reviewed based upon . . . cardiac surgical privileges."  No citation to any Tulane document is provided, despite more than 300 pages of such documents being produced to them.

No such conditions were ever imposed upon Dr. Hartz by Tulane.

[61]Exh. F, Hartz Prod. Resp. No. 9, Ex. 125 8/14/01 Letter Kahn to Hartz.

[62]Exhibit F, Hartz Prod. Resp. No. 9, Ex. 130 1/30/02 Letter Montgomery to Hartz.

[63]Exh. J, Affidavit of Philip Kadowitz, Ph.D., Member Tulane University School of Medicine, Personnel and Honors Committee.

21

previously expressed in May 1999 in urging that Dr. Hartz not be awarded tenure.  In 2002 Dr. Hewitt voted against tenure for Dr. Hartz when the Departmental Personnel and Honors Committee took a tenure vote.  Also Dr. Hewitt wrote a letter urging the School of Medicine's Personnel and Honors Committee that she was not qualified for tenure because she did not have full unrestricted cardiac surgical "pump" privileges much of the time she had been at Tulane.  Dr. Hewitt's letter did not accurately present Dr. Hartz's performance and ignored information about her proctorship and thoracic surgical practice.  Dr. Hewitt was not a member of the Medical School's Personnel and Honors Committee.[64]  The Medical School's Personnel and Honors Committee was unpersuaded by Dr. Hewitt's objections.

Despite the determination that Dr. Hartz was qualified for tenure and the recommendation of the duly constituted Medical School Personnel and Honors Committee to award her tenure, an administrative committee -- the Executive Faculty Committee[65], rejected the recommendation of the Personnel and Honors Committee.

Dr. Hewitt was a participating member of the Executive Faculty Committee, which rejected the Personnel and Honors Committee's recommendation of an award of tenure.  Dr. Hewitt did not abstain from the vote taken by the Executive Faculty Committee.[66]

On June 21, 2002 the Executive Faculty Committee informed Dr. Hartz of its decision to reject the Personnel and Honors

---

[64]See Complaint par. 10.

[65]Exh. F, Exh. 98, School of Medicine Const., Art. III, 2.

[66]See Complaint par. 12.

Committee recommendation to award tenure.  Subsequently, the matter was returned to the Personnel and Honors Committee. Again, on July 15, 2002 the Personnel and Honors Committee voted to recommend an award of tenure.[67]

However, the Executive Faculty Committee, including Dr. Hewitt, rejected, a second time, the July 16, 2002 recommendation of the Personnel and Honors Committee to award tenure.  Under Tulane School of Medicine's Constitution the Executive Faculty Committee accepts or rejects the Medical School's Personnel and Honors Committee recommendation to award tenure.[68]

The Dean, Ian Taylor, M.D., Ph.D., concurred with the Executive Faculty's decision and notified Dr. Hartz by letter of the July 16, 2002 decision on July 17, 2002.  The July 16, 2002 letter also reminded Dr. Hartz that the 2002-2003 academic year would be her terminal year at Tulane.[69],[70]

After the Executive Faculty Committee voted on July 16, 2002, Dr. Hartz inquired from Dr. Roy Weiner, a member of the

---

[67]See Complaint par. 13, also Exh. J, Kadowitz Affidavit.

[68]Exh. F, Hartz Prod. Resp No. 9, Ex. 98 School of Medicine Constitution, Art. III, 2.

[69]This second vote was taken by the Executive Faculty Committee, because per provisions in the Faculty Handbook, the Personnel and Honors Committee was given the opportunity to address the rejection by the Executive Faculty Committee of its tenure recommendation. A letter addressing the rejection of the Personnel and Honors Committee's recommendation and the issue of service to her Department was sent by the Personnel and Honors Committee to the Executive Faculty Committee. Thereafter, the Executive Faculty Committee met again on the subject on July 16, 2002.  A letter dated July 16, 2002 informed Dr. Hartz of the vote.  Exh. F, Hartz Prod. Resp. No. 9, Exh. 60, Minutes — Executive Session of the Executive Faculty Committee, July 16, 2002.

[70]See Complaint par. 14.

Executive Faculty Committee if he had voted in her favor, he stated: "you know the boys always vote together."[71]

Subsequently, Dr. Hartz filed a grievance with the Tulane over the decision of the Executive Faculty Committee to reject the recommendation of tenure.  The Grievance Committee's decision was in Dr. Hartz's favor.  Dr. Taylor, Dean of the Tulane University School of Medicine appealed the Grievance Committee's decision in Dr. Hartz's favor to the Provost, Lestor A. Lefton, who upheld the decision of the Executive Faculty Committee rejecting the recommendation of tenure for Dr. Hartz.  Tulane informed Dr. Hartz of this decision on March 19, 2003.[72]  Dr. Hartz appealed to the Faculty, Tenure, Freedom, and Responsibility Committee ("FTFR"), which upheld the decision of the Executive Faculty Committee not to award tenure.  On May 28, 2003, Scott Cowan, Ph.D., President of Tulane University, approved the FTFR decision, upholding the decision of the School of Medicine's Executive Faculty Committee not to award tenure. Tulane terminated Dr. Hartz's employment on June 30, 2003 (effective July 1, 2003).[73]

## LAW AND ARGUMENT

Dr. Hartz's Title VII claims are not the "underlying claims" with respect to Mr. Kutcher and Ms. Tygier's alleged malpractice. Mr. Farrugia's potential malpractice — allowing the Title VII

---

[71]Depo pp. 200-201; P's Resp .., Ex 12

[72]See Complaint paragraph 16.

[73]See Complaint paragraphs 13-16.   March 26, 2003 Dr. Hartz engaged Mr. Farrugia.

claims to become time—barred —— is the "underlying claim" with
respect to Mr. Kutcher and Ms. Tygier's alleged malpractice.
Without waiving her argument that Mr. Farrugia's potential
malpractice is the "underlying claim" with respect to Mr. Kutcher
and Ms. Tygier's alleged malpractice, in an abundance of caution,
Dr. Hartz addresses Mr. Kutcher and Ms. Tygier's discussion of
Dr. Hartz's Title VII claims against Tulane.

A.   Dr. Hartz's Title VII Prima Facie Case of
     Discriminatory Denial Of Tenure[74]

1.   Dr. Hartz's satisfies the qualified element of a
Title VII <u>prima facie</u> case of discriminatory denial of
tenure under <u>Zahorik</u>.

According to Mr. Kutcher and Ms. Tygier Dr. Hartz was not
qualified for tenure.  However, the determination Dr. Hartz was
qualified for tenure at Tulane by Tulane School of Medicine's
Personnel and Honors Committee, appointed as referents on the
issue of her qualification for tenure, forecloses any argument by
Mr. Kutcher and Ms. Tygier that Dr. Hartz has not satisfied the
"qualified" element of the <u>prima facie</u> case.

"It is recognized that hiring, promotion and tenure
decisions in the university setting are most appropriately made
by persons most familiar with the academic setting.  However,
selection criteria cannot be used as a mechanism for

_____

[74]Dr. Hartz, a female, satisfies the first element of a <u>prima
facie</u> case under <u>McDonnell Douglas</u>.  She is a member of a protected
class.   Mr. Kutcher and Ms. Tygier do not dispute that she
satisfies this element.   Similarly, Dr. Hartz suffered adverse
action.   She was denied tenure.  Mr. Kutcher and Ms. Tygier do not
dispute that she satisfies this element.   Mr. Kutcher and Ms.
Tygier dispute that Dr. Hartz was qualified for tenure.  Also, they
suggest the use of a four part <u>prima facie</u> case is appropriate.
However, as discussed below, that test does not come from tenure
denial cases.   Such a test is inapplicable here.

discrimination." Jepsen v. Florida Board of Regents, 610 F.2d
1379, 21 F.E.P. Cases 1700 (5th Cir. 1980).  The McDonnell
Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d
668 (1973) circumstantial method of proof is available to prove a
discriminatory denial of tenure.  Zahorik v. Cornell University,
729 F.2d 85, 92 (2nd Cir. 1984).[75]  Zahorik at 94 provides:

> Given the particular nature of appointments, renewals
> and termination decisions in academia, it has been held
> that 'a prima facie case that a member of a protected
> class is qualified for tenure is made out by showing
> that some significant portion of the departmental
> faculty, referents or other scholars in that particular
> field had a favorable view on the question.'

Under Zahorik, Dr. Hartz may employ "referents" or other
scholars in the particular field to assist in making a prima
facie case.  Here it is undisputed that "referents", that is the
Tulane School of Medicine's Personnel and Honors Committee,
which, under the provisions of Tulane's Faculty Handbook, is the
duly constituted faculty body charged with rendering a decision
as to whether Dr. Hartz was qualified for an award of tenure,
determined she was qualified for tenure at Tulane and voted in
her favor 7-2 to recommend an award of tenure.[76]  Thus the

---

[75]The direct method of proof is not required.

[76]Exhibit J, Affidavit of Philip Kadowitz, Ph.D., Member
Tulane University School of Medicine, Personnel and Honors
Committee.  Dr. Kadowitz testified:
    At Tulane University School of Medicine when a faculty member
is under review for an award of tenure the decision about that
faculty member's qualification for tenure is referred to the Tulane
University School of Medicine's Promotion and Honors Committee
("School of Medicine's Promotion and Honors Committee");
    He served as a member of the School of Medicine's Promotion
and Honors Committee in 2002 when the tenure dossier of Renee
Hartz, M.D. was referred to the School of Medicine's Promotion and
Honors Committee;
    Renee Hartz's tenure dossier was referred to the School of

determination she was qualified for tenure at Tulane by Tulane
School of Medicine's Personnel and Honors Committee, appointed as
referents on the issue of her qualification for tenure, satisfies
the qualified element of the prima facie case.

    2.    Dr. Hartz's satisfies the qualified element of a
    Title VII prima facie case of discriminatory denial of
    tenure under Bennun.

Although no further inquiry is needed concerning her
qualification for tenure, Dr. Hartz had additional evidence
satisfying the qualified element of a prima facie case.  A tenure
applicant may employ other scholars in her particular field to
assist in satisfying the "qualified" element.  "Qualified" may be
established were the tenure applicant provides a favorable letter
of recommendation from a world renowned member in her field.
Bennun v. Rutgers, 941 F.2d 154, 56 F.E.P. Cases 747, 762 (3rd
Cir. 1991).  Such recommendation shows objectively that the
tenure applicant meets the "qualified" element of a prima facie
case.  Bennun at 762.

Dr.  Hartz's  tenure  dossier  contained  a  letter  from  an
internationally recognized cardiac surgeon, Dr. O.H. Frazier, Chief
of Cardiopulmonary Transplantation, and Director Surgery Research,
Cullen Cardiovascular Research Laboratories, Texas Heart Institute.

---

Medicine's Promotion and Honors Committee for determining whether
she was qualified for an award of tenure;
    On May 20, 2002, after reviewing Renee Hartz's tenure dossier,
the School of Medicine's Promotion and Honors Committee, determined
that Renee Hartz was qualified for tenure at Tulane University
School of Medicine;
    After determining that Renee Hartz was qualified for tenure
at Tulane University's School of Medicine, the School of
Medicine's Promotion and Honors Committee voted 7 to 2 in favor
of a recommendation to award her tenure.

Dr. Frazier's letter expressed his view that Dr. Hartz was qualified for an award of tenure. Dr. Frazier stated:

> [Dr. Hartz] is an excellent technical cardiovascular surgeon and better than comparable surgeons of her rank and station in this profession. . . . If I needed cardiac surgery, I would certainly allow Dr. Hartz to operate on me, and I can find no reason for anyone else, experienced in this field, to recommend otherwise.[77]
> . . . recommend [her] for tenure . . . without reservation.[78]

Dr. Frazier's recommendation in Dr. Hartz's tenure dossier objectively shows that she met the "qualified" element of a prima facie case of discriminatory denial of tenure under McDonnell Douglas Corp. Bennun at 762.

A McDonnell Douglas prima facie case of discriminatory denial of tenure may be established where the plaintiff shows: 1) she was a member of a protected class; 2) was qualified for tenure; and 3) was not granted tenure in circumstances permitting an inference of discrimination. Zahorik at 92. Evidence of bias on the part of individuals involved in the tenure decision may be used to show tenure was not granted in circumstances permitting an inference of discrimination. Zahorik at 93.

3. Dr. Hartz's satisfies the third element of a Title VII prima facie case of discriminatory denial of tenure under Zahorik, i.e., denial of tenure in circumstances permitting an inference of discrimination.

After the Executive Faculty Committee voted on July 16, 2002, Dr. Hartz inquired from Dr. Roy Weiner, a member of the Executive Faculty Committee if he had voted in her favor, he

---

[77]Exhibit F, Hartz Prod. Resp. No. 9, Ex. 76 12/21/98 Letter Frazier to Hewitt, and Ex. 101 (in globo) 1/13/99 Letter Frazier to Hewitt (tenure), 2/15/99 Letter Frazier to Hewitt.

[78]Exhibit F, Hartz Prod. Resp. No. 9, Ex. 101 (in globo) 1/13/99 Letter Frazier to Hewitt (tenure).

stated: "you know the boys always vote together."[79]   Such a statement, referencing gender, made by one of the ultimate decisionmakers who voted to reject the recommendation to award tenure is evidence of anti-female sex discrimination animus. <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).[80]   Dr. Hartz was the only female surgeon in her section of the surgery department, i.e., "Section of Thoracic Surgery".[81]   Dr. Weiner's comment is evidence of bias on the part of individuals involved in the tenure decision which may be used to show tenure was not granted in circumstances permitting an inference of discrimination. <u>Zahorik v. Cornell University</u>, 729 F.2d at 93.

Comments made to an employee may serve as sufficient evidence of sex discrimination if they are: "1) [sex] related; 2) proximate in time to the termination; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision issue." <u>Brown v. CSC Logic, Inc.</u>, 82 F.3d 651, 655 (5th Cir. 1996).   Dr. Weiner's sex-related comments, create an inference that sex bias played a determinative factor in Dr. Hartz's denial of tenure by the Executive Faulty Committee.

Under <u>Zahorik</u>, Dr. Hartz establishes a <u>prima facie</u> case of sex discrimination with regard to her denial of tenure.

---

[79]Exh. A, Hartz Dep. pp. 200-201; Exh. F, Hartz Prod. Resp. No. 9, Ex. 12 (e-mail 8/03/2004).

[80]Under <u>Reeves</u> Dr. Weiner's comment about the vote on Dr. Hartz's tenure decision is evidence of discriminatory intent with respect to Dr. Hartz's discriminatory denial of tenure claim.

[81]Exh F, Hartz Prod. Resp. No. 9, Ex. 62.

4.    The Medical School's Personnel and Honors Committee
decision that Dr. Hartz was qualified for tenure
forecloses argument on that issue.

Mr. Kutcher and Ms. Tygier quote almost verbatim Dr. Hewitt's

letter which sets forth his arguments why, in his opinion, Dr.

Hartz should not be awarded tenure. However, whether Dr. Hartz was

qualified for tenure was not Dr. Hewitt's decision.

It was the duty of the Medical School's Personnel and Honors

Committee to decide whether on the criteria of teaching,

research, and service Dr. Hartz was qualified for tenure.[82]

While the Medical School's Personnel and Honors Committee

considered Dr. Hewitt's opinion, it was unpersuaded by Dr.

Hewitt's objections when it made the determination Dr. Hartz was

qualified for an award of tenure. The Medical School's Personnel

and Honors Committee decided she was qualified for tenure.

Moreover, the decision about Dr. Hartz's qualification for

tenure is not for Mr. Kutcher or Ms. Tygier to make, that

decision was made affirmatively by the Medical School's Personnel

and Honors Committee. Though Mr. Kutcher and Ms. Tygier argue

that Dr. Hartz was not qualified for tenure; that decision is not

for them or even this Court to make. That determination was made

by Tulane School of Medicine's Personnel and Honors Committee,

specifically appointed as referents on the issue of her

qualification for tenure.[83]

---

[82]Dr. Hartz already held the highest academic rank, Professor.

[83]Exh. J, Affidavit of Philip Kadowitz, Ph.D., Member Tulane
University School of Medicine, Personnel and Honors Committee.

5.   Mr. Kutcher and Ms. Tygier make incorrect factual
      assumptions.

Dr. Hartz must point out that Mr. Kutcher and Ms. Tygier's

argument makes incorrect factual assumptions.   Mr. Kutcher and

Ms. Tygier argue that tenure at Tulane was dependent on specific

cardiac surgical "pump" privileges at TUHC.   Such argument is

incorrect.   Dr. Flint, the Chair of the Department of Surgery who

offered her a position at Tulane informed the 2000 FTFR that the

service Dr. Hartz provided through her thoracic surgery practice

qualified her for tenure.   Dr. Flint stated to the FTFR that "Dr.

Hartz was as qualified as anyone in the last ten years."   Dr.

Flint informed the FTFR an offer was made to Dr. Hartz that she

join the Tulane faculty and immediately upon her arrival there

would be submission of her dossier for tenure with full

departmental support.   Dr. Flint advised the FTFR that the offer

imposed no requirement that tenure would be dependent on any

specific surgical privileges at TUHC.[84]

Mr. Kutcher and Ms. Tygier also incorrectly argue Dr. Hartz

"completely lost her surgical privileges at TUHC".[85]

Alternatively, they say she "lost all cardiac surgery privileges

at the affiliated Tulane Hospital".[86]   These statements are

incorrect.   Dr. Hartz continued an active thoracic surgery

---

[84]Hartz Prod. Resp. No. 9, Ex. 35, 3/31/00 Memorandum FTFR,
p.4, n.4.; and Flint Affidavit (cited FTFR Memorandum, p.2)
Defendants' Response to Prod. Rqst. No. 1 – Flint Affidavit (cited
FTFR Memorandum, p.2), Also Exhibit F, Hartz Prod. Resp. No. 9, Ex.
24a – 5/8/97 Letter Flint to Hartz.

[85]Document 63–2, page 15.

[86]See Document 63–2, page 3, Document 65–2, page 3.

practice at Tulane hospital and practiced cardiac surgery at TUHC

as an assisting rather than primary surgeon until her full,

unrestricted "pump privileges" were restored.[87]  "Pump"

surgical privileges permit a surgeon to serve as the primary

surgeon during a cardiac surgery.  Dr. Hartz also maintained her

status as a cardiovascular surgeon with full unrestricted "pump

privileges" at Charity\University Hospital, staffed jointly by

physicians at Tulane and LSU Medical Schools.  While Dr. Hartz

had full unrestricted "pump privileges" at Charity\University

Hospital, and an active thoracic surgery practice at TUHC and

practiced cardiac surgery at TUHC as an assisting rather than

primary surgeon, Dr. Hewitt informed her that she was to perform

no more surgeries at University Hospital.  Dr. Hartz followed the

directive of her Department Chairman, Dr. Hewitt, which limited

her ability to perform cardiac surgery.  While she remained on

Tulane's faculty, she always maintained her full unrestricted

"pump privileges" at Charity\University Hospital.

   6.   Bauer/Rubinstein's four part prima facie case is
        inapplicable to a denial of tenure case.

As discussed above, Dr. Hartz satisfied the three part

McDonnell Douglas Corp prima facie elements used in tenure cases

pursuant to Zahorik.  Mr. Kutcher and Ms. Tygier argue that a

four part prima facie case should be applied here, citing Bauer

v. Abermarle Corp., 169 F.3d 962 (5th Cir. 1999) and Rubinstein

v. Administrators of the Tulane Education Fund, 218 F.3d 392 (5th

Cir. 2000).  However, Bauer is not an academic case; it did not

---

[87]Exh. F, Hartz Prod. Resp. No. 9, Ex. 35, 3/31/00 Memorandum
FTFR, p. 7; Ex 2 Hartz Depo. p. 377.

involve tenure.   While <u>Rubinstein</u> is an academic case, it did not involve tenure, but rather discrimination and retaliation regarding a pay raise (Rubinstein was a tenured Mechanical Engineering Professor).

Therefore, Mr. Kutcher and Ms. Tygier offer an inappropriate version of the <u>prima facia</u> case.   That test has a fourth element -- that the decision by Tulane not to grant tenure was differentially applied to Dr. Hartz.   Such a test is inappropriate.   Without waiving her argument that Mr. Kutcher and Ms. Tygier offer an inappropriate variation of the <u>prima facia</u> case, in an abundance of caution, Dr. Hartz addresses their argument.

a. Male surgeons were treated more favorably than Dr. Hartz.

According to Mr. Kutcher and Ms. Tygier, Dr. Hartz is unable to prove that she was treated differently from persons outside of her protected class under similar circumstances.   They cite Dr. Hartz's response to an Interrogatory.   However, Mr. Kutcher and Ms. Tygier omit part of Dr. Hartz's answer.

INTERROGATORY NO.2 {1 question]:

With regard to the "sex discrimination" in connection with the denial of tenure alleged in paragraph 18 of your Complaint, please identify each instance in which another person was treated differently based upon gender.

ANSWER TO INTERROGATORY NO. 2:

No male surgeon at Tulane has twice been recommended for tenure by a Personnel and Honors Committee and had such votes for the award of tenure vetoed by the Executive Faculty Committee of the School of Medicine.   Thus, Tulane treated similarly situated males more favorably.   Such action was discrimination based on my sex/gender (it was also retaliation for previous protected activity, i.e., 1999 EEOC charge).

Four(sic) male surgeons were tenured at Tulane, after being recommended for tenure by a Personnel and Honors Committee which is the standard practice in academia, Dr. Jaffe, Dr. Litwin, Dr. McSwain, Dr. Hewitt, Dr. Pigott, and Dr. Jansen.

Dr. Hartz testified that Dr. Jaffe, Dr. Litwin, Dr. McSwain, are general surgeons.[88]  None of these physicians ever had cardiac "pump privileges" at TUHC or Charity\University Hospital. Their tenure was not dependent on any specialized surgical privileges.  None of these physicians ever had cardiac "pump privileges" at TUHC or Charity\University Hospital.

Dr. Hartz had a specialty, cardiac surgery; however, at all times she was a member of the Thoracic Section of the Department of Surgery.[89]  At a minimum, she had the same surgical privileges as Dr. Jaffe, Dr. Litwin, and Dr. McSwain throughout the time she was a Professor of Surgery at Tulane.  There is no separate "Cardiac Section".

Dr. Hewitt was a general and vascular surgeon.  Dr. Hewitt never had cardiac "pump privileges" at TUHC or Charity\University Hospital.  Moreover, Dr. Hewitt was awarded tenure after Dr. Hartz joined the Tulane faculty.  His tenure was not dependent on any specialized surgical privileges.  Even after Dr. Hartz's "pump privileges" were restricted, at a minimum, Dr. Hartz had the same surgical privileges as Dr. Hewitt.

Yet the Executive Faculty Committee rejected the recommendation to award her tenure after the determination she

---

[88]Exh. F, Hartz Prod. Resp. No. 9, Ex. 62.  Dr. Jansen was and is a plastic surgeon.

[89]Exh. F, Hartz Prod. Resp. No. 9, Ex. 62.

was qualified for tenure at Tulane by Tulane School of Medicine's Personnel and Honors Committee, appointed as referents on the issue of her qualification for tenure.[90]  Every one of these male surgeons, Drs. Jaffe, Litwin, McSwain, and Hewitt were treated more favorably than Dr. Hartz.  Tulane held her to a higher standard despite that her tenure was not dependent on any specialized cardiac surgical privileges.[91]

Moreover, had her discriminatory denial of tenure not been time-barred she would have challenged Tulane to name any male Professor of Surgery at Tulane with respect to whom the Executive Faculty Committee rejected the recommendation to award tenure after he was determined qualified for tenure by Tulane's School of Medicine's Personnel and Honors Committee, the referents on the issue of qualification for tenure.

Concerning Dr. Pigott, when the Personal and Honors Committee determined he was qualified for tenure and recommended an award of tenure, the Executive Faulty Committee accepted the recommendation.  Thus Dr. Pigott was treated more favorably.  Additionally, Dr. Hartz did not testify "[Dr. Pigott] lost his tenure" as Mr. Kutcher and Ms. Tygier's Memorandum, page 19 (Doc 63-2) states.  Rather Dr. Hartz testified that Dr. Pigott resigned his faculty position at Tulane: ". . . he came back not on the tenure track."[92]

---

[90]Drs. Hewitt and Weiner members of the Executive Faculty Committee voted on the issue of whether to accept the Personal & Honors recommendation to award tenure to Dr. Hartz.

[91]See pages 18–19 above and n. 55. – There was no requirement that tenure would be dependent on any specific surgical privileges at TUHC.

[92]Exh. A, Hartz Deposition p.314.

Dr. Pigott voluntarily resigned his tenured position. When he did so, he voluntarily relinquished his tenure. When Dr. Pigott returned to Tulane he did not seek tenure. Dr. Pigott's relinquishment of tenure did not concern a "denial of tenure". Dr. Pigott's resignation and subsequent reemployment at Tulane has no bearing on whether male surgeons were treated more favorably than Dr. Hartz with regard to a decision by the Executive Faculty Committee to reject the recommendation to award her tenure after the determination she was qualified for tenure at Tulane by Tulane School of Medicine's Personnel and Honors Committee, appointed as referents on the issue of her qualification for tenure. A resignation and attendant voluntary relinquishment of tenure and a decision to deny tenure are not comparable actions. In fact a resignation is voluntary action by an employee while a denial of tenure is an adverse action by the employer. Such noncomparable actions provide no evidence about discrimination.

Dr. Jansen, a plastic surgeon, never had cardiac "pump privileges" at TUHC or Charity\University Hospital or any other cardiac privileges for that matter.

No male surgeon at Tulane has twice been recommended for tenure by a Personnel and Honors Committee and had such votes for the award of tenure rejected by the Executive Faculty Committee of the School of Medicine. Accordingly, Tulane treated similarly situated males more favorably. Such action was discrimination based on sex/gender in Tulane's denial of tenure.

Contrary to Mr. Kutcher and Ms. Tygier assertions, the

abovementioned evidence shows that Dr. Hartz was treated differently from persons outside of her protected class under similar circumstances.

   b. Dr. Hartz had full, unrestricted cardiac privileges ("pump privileges") when the Personnel and Honors Committee determined she was qualified for tenure.

It should be noted that when Dr. Hartz was determined qualified for tenure by the Personnel and Honors Committee she had full, unrestricted cardiac privileges ("pump privileges"); nonetheless, an award of tenure was not dependent on such "pump privileges". Tenure was not dependent on any specific surgical privileges at TUHC.[93] Otherwise, the male surgeons, Drs. Jaffe, Litwin, McSwain, Hewitt, and Jansen would not have received tenure.

Dr. Flint, the Chair of the Department of Surgery who offered her a position at Tulane had specifically stated that the service Dr. Hartz provided through her thoracic surgery practice qualified her for tenure. Dr. Flint stated to the FTFR that "Dr. Hartz was as qualified as anyone in the last ten years" and that the offer to Dr. Hartz imposed no requirement that tenure would be dependent on any specific surgical privileges at TUHC.[94]

   7. Additional evidence concerning Dr. Hartz's denial of tenure in circumstances permitting an inference of discrimination.

In her Complaint against Tulane and TUHC Dr. Hartz alleged

_____

[93]Exh. F, Hartz Prod. Resp., Ex. 35, 3/31/00 Memorandum FTFR, p.4, n.4.; and Flint Affidavit (cited FTFR Memorandum, p.2) Defendants' Response to Prod. Rqst. No.1 — Flint Affidavit (cited FTFR Memorandum, p.2).

[94]Exh. F, Hartz Prod. Resp. No. 9, Ex. 35, 3/31/00 Memorandum FTFR, p.4, n.4.; and Flint Affidavit (cited FTFR Memorandum, p.2) Defendants' Response to Prod. Rqst. No. 1 — Flint Affidavit (cited FTFR Memorandum, p.2).

37

that during her employment at Tulane, her Chairman, Dr. Hewitt, Chairman of Tulane's Section of Thoracic Surgery, Department of Surgery, discriminated against her on the basis of her sex and repeatedly misrepresented her clinical and academic performance. Dr. Hartz's Complaint also alleges that Dr. Hewitt retaliated against her because she had previously filed an EEOC charge in 1999.[95]  Dr. Hewitt also retaliated against Dr. Hartz for seeking redress of her claim of sex discrimination through the University's internal channels set up to address such matters.[96]

Additionally insight into the discrimination Dr. Hartz suffered at Tulane is best described in the Affidavit of Dr. James V. Talano, a Board Certified Cardiologist. Dr. Talano was a member of the Department of Medicine at Tulane University from April 1996 until October 2002 and was the Chief of Cardiology in the Department of Medicine at Tulane University from April 1996 through 1998. He testified:

> [During the period of time Dr. Hartz] lacked unrestricted cardiac surgical privileges at TUHC, Dr. Hartz continued to work at Tulane, continued to improve the general surgical milieu and the training of house officers. Dr. Hartz also continued to operate at MCLNO University Hospital where she had excellent results in cardiac surgical outcomes. Despite these results, Dr. Robert Hewitt, Chief of Surgery, restricted her from performing surgery at that institution. This is another example of discriminatory treatment based on her sex.
> Dr. Hartz's surgical outcomes at Tulane were similar to the other five cardiac surgeons with which I have been associated at Tulane University, the problems of which are rooted in system problems.
> Dr. Hartz was singled out and made a scapegoat for the system problems at TUHC. She was singled out because she is a female. There is no other statistical evidence

---

[95] See Complaint par. 9.

[96] See Complaint par. 9.

for her having received the treatment she received at Tulane other than her gender.

While I was Chief of Cardiology in the Department of Medicine at Tulane certain members of the Section of Cardiology and Department of Surgery actively discriminated against Dr. Hartz and routinely referred to her as "that female surgeon" in a derogatory manner.[97]

Some of Dr. Hewitt's other discriminatory actions are documented in Dr. Hallett's affidavit.[98] Dr. Hewitt's discriminatory actions included limiting referrals to Dr. Hartz, excluding her from the department's "call schedule", forbidding her to perform cardiac surgery at University/Charity Hospital despite her full unrestricted cardiac privileges there ("pump privileges), reducing her teaching/committee assignments, preventing residents from assisting in her surgeries[99], vigorously opposing her tenure application with the Medical School Personnel and Honors Committee, not recusing himself from Executive Faculty Committee, and urging the Executive Faculty Committee to reject the Personnel and Honors Committee recommendation of award of tenure. The Executive Faculty Committee vote was tainted by the discriminatory animus of Drs. Hewitt and Dr. Weiner. Dr. Hewitt engaged in discriminatory and retaliatory actions with the aim of sabotaging Dr. Hartz career and ability to gain tenure.

Dr. Hallett testifies in his affidavit that after he opposed Dr. Hewitt's discriminatory treatment of Dr. Hartz, Tulane University School of Medicine retaliated against him.[100] Tulane

---

[97]Exh. G, Affidavit of Dr. Talano.

[98]Exh. H, Affidavit of Dr. Hallett.

[99]Exh. F, Hartz Prod. Resp. No. 9, Ex. 69.

[100]Exh. H, Affidavit of Dr. Hallett.

withheld his monthly paycheck.   This caused him to miss a child support payment which caused him substantial personal difficulty. Then he was told that his contract would not be renewed, that he was "too old" to learn to do research, although he was not "too old" to do research until after he opposed the discriminatory treatment of Dr. Hartz.

Tulane's tenure denial was unheard of: no male surgeon at Tulane has twice been determined to be qualified for tenure and recommended for tenure by a Personnel and Honors Committee and had such votes recommending the award of tenure rejected by the Executive Faculty Committee of the School of Medicine.   Thus, Tulane treated similarly situated males more favorably than it did Dr. Hartz.   Such action was discrimination based on Dr. Hartz's sex (it was also retaliation for her previous protected activity discussed herein).

B.   Dr. Hartz's Denial Of Tenure Was Retaliation For
     Engaging In Protected Activity

Dr. Hartz's "underlying claim" for Mr. Kutcher and Ms. Tygier's alleged malpractice, is Mr. Farrugia's potential malpractice.   However, in an abundance of caution, Dr. Hartz addresses below Mr. Kutcher and Ms. Tygier's discussion of Dr. Hartz's retaliation claim against Tulane.

Dr. Hartz's Title VII litigation against Tulane and TUHC was dismissed on Tulane and TUHC's 12(b)(6) motions because the EEOC charge was not timely filed (and additionally because TUHC was not named in the charge).   Tulane never articulated a nondiscriminatory and/or nonretaliatory reason, if any existed, for its adverse employment actions.   Mr. Kutcher and Ms. Tygier cannot speculate

40

what they contend Tulane might have asserted in an effort to shoulder its burden under McDonnell Douglas. Dr. Hartz's evidence establishes a prima facie case of retaliation which, because of the posture of the Hartz v. Tulane litigation, was never rebutted by Tulane. Thus the inference of discrimination created by the prima facie claim remains unchallenged.

Dr. Hartz's retaliatory denial of tenure claim focused on the actions of Dr. Hewitt. Dr. Hewitt's actions are discussed above in the context of sex discrimination. However, Dr. Hewitt's actions also form the basis of Dr. Hartz's retaliation claim. The discussion about his actions discussed above are fully incorporated herein as if repeated verbatim.

Under the controlling legal authority in this circuit, to establish a prima facie case of retaliation, the plaintiff must show: (1) he engaged in protected activity; (2) an adverse employment action occurred; and (3) there was a causal connection between the protected activity and the adverse employment action.[101] Long v. Eastfield College, 88 F.3d 300, n. 4 at 305 (5th Cir. 1996). The burden shifting structure applicable to federal disparate treatment Title VII cases, as set forth in McDonnell Douglas Corp., 411 U.S. at 802-804, 93 S.Ct. at 1824-25, is applicable to unlawful retaliation cases. Long at 304.

Under the McDonnell Douglas Corp., "pretext" or circumstantial analysis, once the prima facie case is shown, the

---

[101]The causal connection is a causation-in-fact or but for causation. Shirley v. Chrysler First, Inc., 970 F.2d 39 (5th Cir. 1992), citing Jack v. Texaco Research Ctr., 743 F.2d 1129, 1131 (5th Cir. 1984).

defendant must produce some nondiscriminatory reason for its
action.  Long, 88 F.3d at 304–305; Shirley v. Chrysler First,
Inc., 970 F.2d 39, 42 (5th Cir. 1992).  Then the plaintiff must
show that the employer's reason is merely a pretext for
retaliation.

An employee who asserts employment retaliation bears the
burden of showing a causal connection between the protected
activity and the adverse action undertaken by the employer.  To
establish a causal connection the protected activity need not be
the sole or only reason behind the employer's retaliatory conduct.
Long, at 305 n. 4, explaining the causation element.  Long 305 n.
4 explains that the "plaintiff may satisfy the causal link element
of his prima facie case by showing that the protected activity and
the adverse employment action 'were not wholly unrelated' . . . a
plaintiff need not prove that her protected activity was the sole
factor motivating the employer's challenged decision in order to
establish the 'causal link' element of a prima facie case."

There can be no serious argument that Dr. Hewitt's actions,
including repeatedly misrepresenting her clinical and academic
performance, limiting referrals to Dr. Hartz, excluding her from
the department's "call schedule", forbidding her to perform cardiac
surgery   at   University/Charity   Hospital   despite   her   full
unrestricted cardiac privileges there ("pump privileges), reducing
her teaching/committee assignments, preventing residents from
assisting in her surgeries[102], vigorously opposing her tenure
application with the Medical School Personnel and Honors Committee,

_____

[102]Exh. F, Hartz Prod. Resp. No. 9, Ex. 69.

42

not recusing himself from Executive Faculty Committee, and urging the Executive Faculty Committee to reject the Personnel and Honors Committee recommendation of award of tenure, and Dr. Hartz's protected activity 'were not wholly unrelated'.

Under McDonnell Douglas Corp. v. Green, supra, when Mr. Hartz established the elements of a prima facie case of retaliation, she created a rebuttable presumption of retaliation. To establish a prima facie case of retaliation, nothing more would have been required of her.

At page 20 (63-2) Mr. Kutcher and Ms. Tygier state:

> Tulane provided several nondiscriminatory reasons for the decision to not grant tenure to the plaintiff, shifting the burden back on the plaintiff to prove conclusively that Tulane retaliated against her.  Plaintiff has no evidence of such unlawful conduct, and therefore, Dr. Hartz's retaliation claim also lacks merit."

Mr. Kutcher and Ms. Tygier statement is absurd. Tulane never "provided several nondiscriminatory reasons for the decision to not grant tenure to the plaintiff". Tulane never filed an answer. Tulane was dismissed on a 12(b)(6). Here, Dr. Hartz's "underlying claim" for Mr. Kutcher and Ms. Tygier's alleged malpractice, is Mr. Farrugia's potential malpractice. Further, Tulane never articulated a nondiscriminatory and/or nonretaliatory reason, if any existed, for its adverse employment actions. Mr. Kutcher and Ms. Tygier speculate what they contend Tulane might have asserted in an effort to shoulder its burden under McDonnell Douglas. No one will ever know what Tulane might have asserted, because the EEOC charge was untimely. Had Mr. Kutcher or Ms. Tygier informed Dr. Hartz of Mr. Farrugia potential malpractice, then the underlying claim would have been Dr. Hartz's dispute with Tulane.

43

However, Mr. Kutcher or Ms. Tygier admit they did not inform Dr.
Hartz about Mr. Farrugia's potential malpractice.

C.     Scope Of Mr. Kutcher and Ms. Tygier's Duty Of
       Representation

Mr. Kutcher and Ms. Tygier essentially maintain that Dr. Hartz
sought them for a ministerial duty, functioning as little more than
scribes -- editing a letter, rather than as lawyers.   They cite
Grand Isle Campsites v. Cheek, 62 S.2d 350 (La. 1972).   However,
Cheek involved a scope of representation "limited by the express
agreement between [the lawyer] and the corporation's officers."

Reviewing a letter written to Ms. Smith may have been included
in Mr. Kutcher and Ms. Tygier's representation; however, Mr.
Kutcher and Ms. Tygier admit in their Answer and Dr. Hartz
testified in her deposition that Dr. Hartz sought Mr. Kutcher and
Ms. Tygier's advice about her "dispute with Tulane".[103]   Their
Answer, paragraph 26 states: "It is admitted that while plaintiff
was continuing to be represented by defendant Victor Farrugia,
plaintiff sought additional legal counsel from the law firm
defendants concerning her dispute with Tulane."[104]   No such
contractual limitation on the representation by Mr. Kutcher and Ms.

_____

[103]Dr. Hartz has published well in excess of 50 scholarly peer
reviewed papers.   It strains credulity to assert Dr. Hartz sought
legal counsel for merely editorial advice.   Similarly, it strains
credulity that Mr. Kutcher and Ms. Tygier argue here that editing
a letter to Mary Smith, Tulane's EEO, was tenure negotiations.   It
also strains credulity that Mr. Kutcher and Ms. Tygier argue that
there only involvement was tenure negotiations when there could not
possibly be any at that juncture, and the draft letter "Document
63-3, Exhibit 5" discusses gender discrimination, and when should
Dr. Hartz "file an EEOC charge", etc.

[104]See Note 10, above, i.e., Complaint par. 26., Answer par.
26, and Exhibit A, Hartz Deposition, pages 262, 265, 259.

Tygier is present here.   Mr. Kutcher and Ms. Tygier duties were
more comprehensive.

One fact is certain: Mr. Kutcher and Ms. Tygier represented
Dr. Hartz from June 22, 2003 until July 16, 2003.  Dr. Hartz
depended on Mr. Kutcher and Ms. Tygier.  During that period of
time of representation, unquestionably, Dr. Hartz had asked Mr.
Kutcher and Ms. Tygier whether she was doing everything possible
to advance her dispute with Tulane.  Clearly, Mr. Kutcher and Ms.
Tygier reassured her that all was well, because ultimately her
dispute with Tulane returned back to Mr. Farrugia — with no
warnings, alarm, signal, sign, portent, counsel, caution, or
notice that all was not well.

Having availed herself of some of the foremost members of
the Louisiana Bar, i.e., Mr. Kutcher and Ms. Tygier, Dr. Hartz
was assured there were no legal technicalities with prosecuting
her dispute with Tulane.  As this memorandum demonstrates, Dr.
Hartz had a solid Title VII claim seeking reinstatement as a
tenured Professor of Surgery.  Dr. Hartz labored under that
assumption from July 2003 until June 2006.  She certainly could
have taken other action had she known what there were legal
technicalities precluding her from prosecuting her dispute with
Tulane.  To Dr. Hartz' dismay, the favorable outcome she strived
for and suffered for is vanished through a legal technicality she
did everything in her power to prevent.

But for Mr. Kutcher and Ms. Tygier, she could have pursued a
legal malpractice claim against Mr. Farrugia concerning the
untimely EEOC charge.  She could have moved on with her life when

her skills and her utility were more of a hot commodity.  All
that is lost now, thanks to Mr. Kutcher and Ms. Tygier.  When a
client, like Dr. Hartz, seeks advice from an attorney, an
attorney—client relationship exists with that attorney for that
advice.  Moreover, the existence of an attorney—client
relationship turns largely on the client's subjective belief that
it exists.  <u>Louisiana State Bar Ass'n v. Bosworth</u>, 481 So.2d 567,
571 (La. 1986).  The evidence shows Dr. Hartz certainly believed
Mr. Kutcher and Ms. Tygier were representing her interests in her
dispute with Tulane.

Mr. Kutcher and Ms. Tygier cite <u>Buras v. Marx</u>, 892 So.2d 83
(La. App. 5th Cir. 2004), <u>cert. denied</u>, 896 So.2d 70 (La. App.
5th Cir. 2005), where after a consultation about a malpractice
claim the defendant attorneys declined representation and failed
to advise Mr. Buras of prescription/peremption dates.  After the
Court found it "troubling" defendants failed to advise Mr. Buras,
in writing, of refusal to take his claim and failed to advise Mr.
Buras of looming prescription and peremptive dates, the Court
held the plaintiff failed to meet his burden of proof by not
calling an expert to establish the appropriate standard of
conduct in the legal community.  The court stated that where a
plaintiff merely cites to the Rules of Professional Conduct, it
does not prove that the attorney's conduct fell below the
standard of practice in the community.  The <u>Buras</u> court said
expert testimony is required.  <u>Buras</u> at 87.  Dr. Hartz has
offered expert testimony that Mr. Kutcher and Ms. Tygier's
"conduct fell below the standard of practice in the

community".[105]

Defendants' place much stock on the opinion of Mr. Leslie Schiff, Defendants' legal malpractice expert. However, on February 17, 2009 Dr. Hartz submitted a motion seeking to strike his opinions in this matter as they are unreliable for the following reasons:

1) Mr. Schiff's opinion ignores the fact that Mr. Kutcher and Ms. Tygier admit in their Answer that an attorney-client relationship existed concerning Dr. Hartz's "dispute with Tulane."[106]

2) Mr. Schiff assumed a very limited -- virtually ministerial -- representation by Defendants, Mr. Kutcher and Ms. Tygier. Such an assumption is at odds with the fact that Mr. Kutcher and Ms. Tygier admit in their Answer that an attorney-client relationship existed concerning Dr. Hartz's "dispute with Tulane." Mr. Schiff's assumption concerning the scope of the representation by Defendants, Mr. Kutcher and Ms. Tygier, is not grounded in reality and thus is speculative. The opinion is lacking in factual support and based on a flawed, incorrect assumption.

Mr. Kutcher and Ms. Tygier also attempt to blur who represented Dr. Hartz after they no longer did. They suggest Ms. Giorlando perhaps represented Dr. Hartz, after their representation ended did, and she should have notified Dr. Hartz of Mr. Farrugia potential malpractice. First, Ms. Giorlando was diagnosed with

---

[105]See page 8 above for a full discussion, also Exhibit C, Alston Expert Report and Affidavit.

[106]See Complaint par. 26; and Answer par. 26; Schiff Report indicates the Defendants' Answer was not reviewed.

cancer, and ceased representing Dr. Hartz in 2000.   Dr. Hartz testified that she did not thereafter contact Ms. Giorlando about legal issues.[107]

Mr. Kutcher and Ms. Tygier also intimate that Dr. Hartz contacted undersigned counsel during the time before her potential malpractice claim against Mr. Farrugia with respect to the untimely EEOC charge was perempted.   However, Dr. Hartz testified she contacted undersigned counsel the first few days of June 2006 "for sure".[108]    Additionally, without waiving attorney-client privilege, timesheets for this period of time substantiate Dr. Hartz's recollection.[109]

## CONCLUSION

For all the reasons discussed above, there are genuine issues of material fact in dispute.   Accordingly, this Honorable Court must deny Defendants' motions for summary judgment (document 63-2 & 65-2).   Dr. Hartz's legal malpractice claim must proceed to a trial on the merits.

Respectfully submitted,

Roger D. Phipps #20326
PHIPPS & PHIPPS
541 Exposition Boulevard
New Orleans, Louisiana 70118
(504) 899-0763

---

[107]Exhibit A, Hartz deposition, page 258.

[108]Exhibit A, Hartz deposition, page 243.

[109]Exhibit K.

48

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this 25th day of February, 2009, served a copy of the foregoing pleadings on counsel for all parties to this proceeding, by 1st Class U.S. Mail, postage prepaid.

_Roger D. Phipps #20326_