UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RENEE S. HARTZ, M.D.                          CIVIL ACTION

VERSUS                                        NO: 06-3164

VICTOR R. FARRUGIA, ROBERT                    SECTION: "A" (5)
A. KUTCHER, NICOLE TYGIER,
CHOPIN, WAGAR, RICHARD &
KUTCHER, LLP

## ORDER AND REASONS

Before the Court are the following motions: **Motion for Summary Judgment (underlying claim) (Rec. Doc. 63)**, **Motion for Summary Judgment (malpractice claim) (Rec. Doc. 65)**, **Motion to Strike Plaintiff's Opposition to Defendants' Motions for Summary Judgment (Rec. Doc. 91)** filed by defendants Robert A. Kutcher, Nicole Tygier, & Chopin, Wagar, Richard & Kutcher LLP; **Motion for Summary Judgment (Rec. Doc. 68)**, **Motion to Exclude the Testimony of Lelise J. Schiff (Rec. Doc. 69)** filed by plaintiff Renee S. Hartz, M.D. ("Hartz"). All motions are opposed. The motions, set for hearing on March 4, 2009, are before the Court on the briefs without oral argument.[1] For the reasons that follow, the

---

[1] The motion to strike is set for hearing on the April 1, 2009, hearing date.

Defendants have requested oral argument but the Court is not persuaded that oral argument is necessary to resolve the issues presented.

Motion for Summary Judgment (malpractice claim) is GRANTED and the remainder of the motions are DENIED.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On June 8, 2006, Hartz filed Civil Action 06-2977 in this Court against The Administrators of the Tulane Educational Fund ("Tulane"), and University Healthcare System, LC d/b/a Tulane University Hospital and Clinic ("TUHC") claiming sexual discrimination and retaliation. Hartz, a thoracic surgeon, had been employed at Tulane's School of Medicine as a Professor of Surgery until June 30, 2003, when she was terminated after twice being denied tenure. Hartz alleged that she had been the victim of sexual discrimination, including being subjected to a hostile work environment, that began within four months of her arrival at Tulane in July 1997. According to Hartz, the discrimination had culminated with the second denial of tenure that ultimately led to her termination. Civil Action 06-2977 was filed on behalf of Hartz by attorney Roger D. Phipps who began representing Hartz on or about June 1, 2006, and continues to represent her at present.

On March 26, 2003, Hartz had retained Victor R. Farrugia, an attorney at law, to represent her in conjunction with the second denial of tenure. (Rec. Doc. 63, Exh. 10, Representation Agreement). Plaintiff had first received notice that she was being denied tenure on June 21, 2002, which means that she had

300 days from that date, or until April 17, 2003, to file her charge of discrimination with the EEOC, or possibly as late as May 12, 2003.[2]  Hartz did not file an EEOC charge until August 22, 2003 and as a result her Title VII claims against Tulane (and TUHC) were ultimately found to be time-barred.  Hartz v. Admin. of Tulane Educ. Fund, No. 07-30506, 2008 WL 1766886 (5th Cir. Apr. 16, 2008) (unpublished).  As part of the case sub judice, Hartz sued Farrugia for legal malpractice alleging that he did not advise her to file the EEOC charge when she received notice of the denial of tenure and that it was due to his negligent representation that she waited until August 2003--after she had actually been terminated--to file the charge.  (Rec. Doc. 63, Exh. 11, EEOC charge).  Unfortunately, Hartz did not learn of Farrugia's omission regarding the EEOC charge until after the strict permemptive periods imposed on claims for attorney malpractice under Louisiana law had already run.  See La. R.S. § 9:5605.  Consequently, the Court dismissed those claims on July

---

[2] Hartz was first notified on June 21, 2002, of the adverse tenure decision but the matter was considered a second time and Hartz was notified on or about July 16, 2002, of the second adverse decision.  When Civil Action 06-2977 was before the Fifth Circuit on interlocutory appeal, the court declined to decide whether the Title VII limitations period began running with the first notice or with the second notice because either way Hartz's EEOC charge was untimely.  Hartz v. Admin. of Tulane Educ. Fund, No. 07-30506, 2008 WL 1766886, at *8 n.2 (5th Cir. Apr. 16, 2008) (unpublished).

18, 2008, as being untimely. (Rec. Doc. 39). Hartz's
malpractice claim against Farrugia based on his failure to file a
state law discrimination claim, although timely, was dismissed on
July 18, 2008, and October 3, 2008, because Tulane is not an
"employer" for purposes of Louisiana's anti-discrimination law.
(Rec. Docs. 39 & 53). Thus, Farrugia is no longer a party to
this lawsuit.

As part of the case sub judice, Hartz also sued attorneys
Robert A. Kutcher, Nicole Tygier, and the law firm of Chopin,
Wagar, Richard & Kutcher, LLP (collectively "the Chopin
Defendants") alleging that they failed to inform her that
Farrugia might have been negligent regarding the timing of the
EEOC charge. Hartz had consulted with these attorneys on July
16, 2003, and she blames them for losing her rights to proceed
against Farrugia on the legal malpractice claim related to the
untimely EEOC charge.[3] As the case now stands, the sole
remaining claim to be tried is Hartz's claim that the Chopin

_____

[3] Hartz had also sued the Chopin Defendants for failing to
inform her about her rights under state law. This claim was
dismissed on October 6, 2008, for the same reasons that the claim
was dismissed against Farrugia, i.e., that Hartz never had a
claim under state law because Tulane does not satisfy the
definition of an "employer." (Rec. Doc. 54). In that same
ruling the Court noted that Hartz never had a claim against the
Chopin Defendants for failing to file a timely EEOC charge
because the filing deadline had already passed by the time that
Hartz consulted with them. (Rec. Doc. 54).

Defendants are liable for failing to advise her of a potential legal malpractice claim against Farrugia for his failure to timely file an EEOC charge. This claim is set to be tried to the Court sitting without a jury on April 20, 2009.

The Chopin Defendants now move for summary judgment on the underlying claim and on the legal malpractice claim. As to the underlying claim, the Chopin Defendants argue that Hartz's discrimination claims against Tulane had no merit and therefore she could not have recovered against Farrugia for failing to pursue such a claim.[4] As to the legal malpractice claim, the Chopin Defendants argue that their representation of Hartz was very specific and limited in scope and that they had no duty to

---

[4] In legal malpractice cases Louisiana has traditionally employed a "case within a case" requirement such that the plaintiff must prove not only that the attorney was negligent in handling his client's claim but also that the underlying claim would have been successful but for the attorney's omission. See Jenkins v. St. Paul Fire & Marine Insurance Co., 422 So. 2d 1109 (La. 1982).

Contrary to Hartz's contentions, the underlying claim in this case is not limited to the malpractice suit against Farrugia but rather additionally includes the discrimination claims against Tulane. The calculations for earning loss contained in Hartz's economist's report clearly indicate that the damages she seeks to recover in this case are directly related to her loss of tenure at Tulane, (Rec. Doc. 74, Exh. D, Dalton Report), and the only way that she can recover damages on that basis is if Tulane *unlawfully* denied her tenure. Likewise contrary to Hartz's contentions, she cannot carry her burden on the discrimination claims by relying solely on a prima facie case of discrimination, assuming *arguendo* that under these facts she has established a prima facie case.

render any advice or opinion to Hartz regarding any potential legal malpractice by Farrugia.

Hartz also moves for summary judgment arguing that she is entitled to judgment as a matter of law on the legal malpractice claim against the Chopin Defendants.

## II. <u>DISCUSSION</u>

The threshold question presented by all three motions for summary judgment, and in particular the Chopin Defendants' motion for summary judgment on the legal malpractice claim, is whether the Chopin Defendants had a duty to inform Hartz regarding any potential legal malpractice by Farrugia. In the absence of any such duty, Hartz has no legal malpractice claim against the Chopin Defendants.

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-movant, "show that there is no genuine issue as to any material fact." <u>TIG Ins. Co. v. Sedgwick James</u>, 276 F.3d 754, 759 (5th Cir. 2002) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986)). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Id.</u> (citing <u>Anderson</u>, 477 U.S. at 248). The court must draw all

justifiable inferences in favor of the non-moving party. Id. (citing Anderson, 477 U.S. at 255). Once the moving party has initially shown "that there is an absence of evidence to support the non-moving party's cause," Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986), the non-movant must come forward with "specific facts" showing a genuine factual issue for trial. Id. (citing Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986)). Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial. Id. (citing SEC v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1993)).

In order to establish a claim for legal malpractice, a plaintiff must prove 1) the existence of an attorney-client relationship, 2) negligent representation by the attorney, and 3) loss caused by that negligence. Teague v. St. Paul Fire & Marine Ins. Co., 974 So. 2d 1266, 1272 (La. 2008) (citing Costello v. Hardy, 864 So. 2d 129, 138 (La. 2004)). A failure to act will give rise to civil liability only if it occurs within the context of a duty to act. Lifemark Hosp., Inc. v. Jones, Walker, Waechter, Poitevent, Carrere & Denegre, No. 94-1258, 1997 WL 33473806, at *5 (E.D. La. Nov. 13, 1997) (Fallon, J.). In the case of legal malpractice duty is defined by the attorney-client

relationship.  Id. (citing Grand Isle Campsites, Inc. v. Cheek, 262 So. 2d 350 (La. 1972); Delta Equip. & Constr. Co. v. Royal Indem. Co., 186 So. 2d 454 (La. App. 1st Cir. 1966)).  The attorney-client relationship is "purely contractual" and results only from "the mutual agreement and understanding of the parties concerned."  Id. (quoting Delta Equip., 186 So. 2d at 458). "Such a relationship is based only upon the clear and express agreement of the parties as to the nature of the work to be undertaken by the attorney and the compensation which the client agrees to pay therefore."  Id.  "Authorization to represent a client in connection with a specific legal matter does not imply authorization to handle all others, nor does the agreement or consent of an attorney to represent a [] client in a particular matter create an attorney-client relationship as regards other business or affairs of the client."  Id.

The foregoing rules are elucidated by the outcome in Buras v. Marx, 892 So. 2d 83 (La. App. 5th Cir. 2004).  In Buras, the plaintiff sued his former attorneys for failing to file a legal malpractice claim against the plaintiff's original attorney who had mishandled a matter.  The defendant attorneys had continued to represent the plaintiff in other aspects of the case but they maintained that they had specifically told the plaintiff that they would not file a legal malpractice claim on his behalf.  The

defendant attorneys did not inform the plaintiff of the pending
prescription dates and the legal malpractice claim against the
original attorney prescribed.  The trial court concluded, as did
the appellate court, that there was no attorney-client
relationship between the plaintiff and defendant as to the
malpractice claim against the original attorney.  _Id._ at 87.  The
appellate court also noted that an attorney is not required to
give notice of prescription dates when representation is refused.
_Id._  However, the dissent pointed out that the duty to inform a
client of pending prescription dates depends on the particular
facts surrounding the attorney-client encounter.  _Id._ at 87-88
(Daley, J., dissenting).  The dissent believed that under the
facts that defendant attorneys did in fact have a duty to advise
the client of the imminent deadline to file a legal malpractice
action.  _Id._

     It is undisputed that an attorney-client relationship
existed between Hartz and the Chopin Defendants as to at least
some part of her dispute with Tulane because the firm provided
legal services to Hartz between June 22, 2003, and July 16, 2003.
(Rec. Doc. 65, Exh. 4, Billing records).  However, cases like
_Buras_ and _Lifemark_, _supra_, demonstrate that the existence of an
attorney-client relationship as to some aspect of the client's
case does not necessarily imply that an attorney-client

relationship exists as to all aspects of the case. The scope of the relationship is based only upon the clear and express agreement of the parties and whether the Chopin Defendants had a duty to inform Hartz about any malpractice by Farrugia will depend on the particular facts surrounding the attorney-client encounter in this case. The record establishes the following.

Hartz hired Farrugia on March 26, 2003, after months of attempting to navigate internal administrative tenure appeals at Tulane on her own. (Rec. Doc. 63, Exh. 10, Representation Agreement). Hartz became concerned around this time because the university provost had sent her a letter on March 11, 2003, advising that she would not receive tenure, and her employment was due to terminate in June of that year. (Hartz depo. at 152-54). Hartz testified that she found Farrugia "difficult to get a hold of," and that he urged her to continue pursuing internal remedies at Tulane. (<u>Id.</u> at 159). Hartz testified that Farrugia had told her that he was extremely pressed for time, and Hartz felt that Farrugia did not seem to have time for her case. (<u>Id.</u> at 187).

Hartz explained that she contacted the Chopin Defendants at the recommendation of an attorney-neighbor who knew defendant Robert Kutcher. (<u>Id.</u> at 188). She testified that she sought out the Chopin Defendants because she could not find Farrugia, she

had been denied tenure, she was panic stricken, and she needed help.[5] (Id. at 252). Hartz did not want to deal with Farrugia any more and she had hoped that the Chopin firm would take her case. (Id. at 252, 255). On June 22, 2003, Kutcher spoke with Hartz on the phone regarding her ongoing tenure negotiations with Tulane and advised her that she could meet with Nicole Tygier, another partner with the firm, the next day if she wished. (Rec. Doc. 65, Exh. 11, Kutcher affid.). Kutcher had no further contact with Hartz after that conversation. (Id.; Hartz depo. at 265).

On June 23, 2003, Hartz met with Tygier and reviewed some documents that she brought with her. (Rec. Doc. 65, Exh. 11, Tygier affid.). Tygier attests that they discussed Hartz's ongoing problems with tenure negotiations and that Hartz specifically requested assistance in preparing a letter to Ms. Mary Smith who was Tulane's EEO Compliance Officer. (Id.). According to Tygier, she revised the letter over the next few days and sent the final draft to Hartz on June 30, 2003, at which time Tygier discussed the letter with her. (Id.). Hartz sent the letter to Smith under her own signature and not that of any attorney with the Chopin firm. (Rec. Doc. 65, Exh. 34).

---

[5] Hartz later learned that Farrugia had been out of town on vacation when she was unable to reach him.

The Smith letter was eight pages of single-spaced text. (Rec. Doc. 65, Exh. 34). The entire representation by the Chopin Defendants, including Kutcher's phone conversation with Hartz, lasted 14.5 hours, the majority of which appears to be time devoted to working on the Smith letter. (Rec. Doc. 65, Exh. 4). The only email in the record is a transmittal of the Smith letter from Tygier to Hartz. (Rec. Doc. 65, Exh. 5).

After June 30, 2003, the date of the Smith letter, the next and final entry in the Chopin Defendants' billing records is dated July 16, 2003, and it states "[p]hone call from client regarding status; second call; hold off while other counsel, Farrugia, negotiates." (Rec. Doc. 65, Exh. 4). According to Tygier, Hartz told her not to take any further action because Farrugia would be handling the continuing negotiations with Tulane." (Rec. Doc. 65, Exh. 11). However, Hartz contends that she did not tell the Chopin Defendants to "hold off" in light of Farrugia but rather the Chopin Defendants told her that they were going to hold off so that Farruiga could continue with the negotiations with Tulane. (Hartz depo. at 254-55). Hartz knew at that point that the Chopin Defendants were refusing her case and that they did not want to represent her. (Hartz depo. at 255, 258, 259).

Hartz confirmed at her deposition that the only documents

that she possessed regarding her representation by the Chopin Defendants were their bills. (Hartz depo. at 244). Hartz never gave the Chopin Defendants a retainer and there was never a written contract of representation. (Id. at 247, 252).

Hartz did in fact continue with Farrugia, in part because she had already paid him a significant retainer. (Id. at 266). In fact, on August 22, 2003, Farrugia accompanied Hartz to the EEOC office to file her charge. Hartz ultimately terminated Farrugia on June 1, 2006, nearly three years later. (Id. at 219). It is undisputed that Hartz had no contact whatsoever with the Chopin Defendants after July 16, 2003, when it became clear that they were refusing her case, until she filed this legal malpractice suit against them. (Hartz depo. at 278-79; Rec. Doc. 65, Exh. 11, Kutcher & Tygier affids.).

The Court is persuaded that the particular facts surrounding Hartz's engagement of the Chopin Defendants establishes that they had no duty to inform her of any omissions regarding Farrugia's representation, and no facts material to this determination are in dispute. Although it might have been Hartz's intention and desire that the Chopin Defendants would take over her case when she became dissatisfied with Farrugia's services, there is nothing in the record that even remotely suggests that the Chopin Defendants agreed to such a broad engagement, or that Hartz even

subjectively believed that they had taken her case. To the contrary, the record suggests a very narrow rendering of services with respect to the Smith letter, at a time when Hartz continued to be represented by Farrugia, and after the Smith letter was completed no other legal services were rendered. Hartz paid no retainer, instead paying on an hourly basis for legal services rendered, and she never signed a representation agreement as she had done with Farrugia. Hartz does not cite to anything that the Chopin Defendants did to mislead her with respect to the services they would render and her deposition makes clear that she knew that her case was being rejected. The undisputed facts establish that the Chopin Defendants' representation was a narrow one, notwithstanding Hartz's hopes to the contrary. Thus, while an attorney-client relationship undisputedly existed between Hartz and the Chopin Defendants from June 22, 2003, through July 16, 2003, the scope of that relationship clearly did not include all aspects of Hartz's case. As explained above, the scope of the relationship is governed by contract and by the agreement of the parties, and nothing in the record, including Hartz's deposition, suggests that the Chopin Defendants agreed to counsel Hartz regarding the filing of an EEOC charge, an undertaking that likely would have led the Chopin Defendants to discover that the filing deadline had lapsed, and therefore would have triggered a

duty to inform Hartz about a potential malpractice claim against Farrugia.[6]  Likewise, nothing in the record suggests that Hartz ever specifically sought the Chopin Defendants' assistance with a legal malpractice claim.

Moreover, there is no evidence that the Chopin Defendants had actual knowledge of a potential legal malpractice claim against Farrugia and nothing on the face of the Smith letter suggests a problem.  Hartz had no idea that Farrugia had missed the filing deadline and she made no suggestion to the Chopin Defendants that she suspected a problem with Farrugia's handling of her claim.  Thus, in order for the Chopin Defendants to discover Farrugia's omission they would have had to unilaterally investigate a potential malpractice claim on Hartz's behalf.  The timeliness of the EEOC charge was not an uncomplicated issue which is why this Court certified its prior ruling to the Fifth Circuit for interlocutory appeal.  Given that the Chopin Defendants performed limited legal work for Hartz and declined to take her case they had no legal obligation to investigate Farrugia's handling of the case.

---

[6] Each side retained an expert to opine on their behalf regarding whether the Chopin Defendants breached a duty owed to Hartz.  (Rec. Doc. 65, Exh. 13 & Rec. Doc. 74, Exh. C).  The legal issues presented in this case are well within the province of the Court to resolve without the need for expert assistance.

Finally, Hartz's claim against the Chopin Defendants suffers from the additional infirmity in that the legal malpractice claim against Farrugia did not prescribe until April 2006,[7] which is nearly 2 years and 9 months after the Chopin Defendants terminated their relationship with Hartz on July 16, 2003. In Oyefodun v. Spears, the Fourth Circuit upheld a trial court ruling that recognized that an attorney could not be liable for legal malpractice when he withdrew from the case almost a year before the case prescribed. 669 So. 2d 1261 (La. App. 4th Cir. 1996). Similarly, the Chopin Defendants are not responsible for the loss of a claim that prescribed nearly three years after their representation ended.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion for Summary Judgment (malpractice claim) (Rec. Doc. 65)** filed by defendants Robert A. Kutcher, Nicole Tygier, & Chopin, Wagar, Richard & Kutcher LLP is **GRANTED**. Plaintiff's complaint is **DISMISSED** with prejudice;

**IT IS FURTHER ORDERED** that the **Motion for Summary Judgment (underlying claim) (Rec. Doc. 63)** filed by filed by defendants Robert A. Kutcher, Nicole Tygier, & Chopin, Wagar, Richard & Kutcher LLP is **DENIED** as moot;

---

[7] Three years after the EEOC charge should have been filed in April 2003.

**IT IS FURTHER ORDERED** that the **Motion to Strike Plaintiff's Opposition to Defendants' Motions for Summary Judgment (Rec. Doc. 91)** filed by defendants Robert A. Kutcher, Nicole Tygier, & Chopin, Wagar, Richard & Kutcher LLP is **DENIED**;

**IT IS FURTHER ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 68)** filed by plaintiff Renee S. Hartz, M.D. is **DENIED**;

**IT IS FURTHER ORDERED** that the **Motion to Exclude the Testimony of Lelise J. Schiff (Rec. Doc. 69)** filed by plaintiff Renee S. Hartz, M.D. is **DENIED** as moot.

March 31, 2009

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE